**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ELAINE M. COLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CASE NO: 2:06cv378-WKW** |
| | ) | |
| | ) | |
| **ALABAMA MEDICAID AGENCY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

# ALABAMA MEDICAID AGENCY'S MEMORANDUM OF LAW
# IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

MARK D. WILKERSON (WIL072)
AMANDA C. CARTER (CAR116)
WILKERSON & BRYAN, P.C.
405 South Hull Street
Montgomery, AL 36104
Telephone:  (334) 265-1500
Facsimile:  (334) 265-0319
mark@wilkersonbryan.com
amanda@wilkersonbryan.com

**Attorneys for Defendant**
**Alabama Medicaid Agency**

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS....................................................................... i

TABLE OF AUTHORITIES ............................................................. iii

I.      SUMMARY JUDGMENT STANDARD............................................. 1

II.     SUMMARY OF THE ARGUMENT ................................................. 2

III.    NARRATIVE STATEMENT OF UNDISPUTED FACTS ................. 3

        A.      The Plaintiff's Job History with Medicaid................................ 3

        B.      Memorandum to Personnel File and Appraisal ........................ 4

        C.      Plaintiff's July 20, 2004 Grievance and the
                Agency's Investigation ............................................................ 10

        D.      May 13, 2004 CAP and July 22, 2004 Appraisal Conducted
                By Mike Murphy........................................................................ 14

        E.      The Plaintiff's Other Claims..................................................... 19

IV.     SUMMARY OF THE PLAINTIFF'S CLAIMS ................................. 20

V.      ARGUMENT...................................................................................... 22

        A.      The Plaintiff Did Not Suffer Discrimination in
                Performance Appraisals Costing Her Promotional
                And Advancement Opportunities. ............................................. 22

                i.      The Memorandum and Appraisal Performed by
                        Finch and Lackey Were Not Discriminatory................ 23

                        a.      The Memorandum and Appraisal
                                Were Not Adverse Employment Actions ......... 23

                        b.      The Memorandum and Appraisal Did Not
                                Cost the Plaintiff Promotional and Advancement
                                Opportunities...................................................... 26

   c. The Plaintiff Does Not Allege, Much Less Prove, That Similarly Situated Employees Were Treated More Favorably................................................... 30

  ii. The Corrective Action Plan and Appraisal by Murphy Were Not Discriminatory or Retaliatory......... 33

   a. The Corrective Action Plan and Appraisal Were Not Adverse Employment Actions ......... 33

   b. Similarly Situated Employees Were Not Treated More Favorably .................................... 37

   c. Murphy's Actions Were Not Retaliatory.......... 40

 B. The Plaintiff's Supervisors Had Legitimate Nondiscriminatory Reasons for the Memorandum, Appraisals and the CAP ......... 44

 C. The Lack of a Transfer to Another ASA-II Position Was Not An Adverse Employment Action.............................................. 46

 D. Medicaid is Due Summary Judgment on Plaintiff's Additional Claims Not Included in the Complaint .................................... 49

VI. CONCLUSION.................................................................... 56

CERTIFICATE OF SERVICE ........................................................ 58

## <u>TABLE OF AUTHORITIES</u>

<u>Pages</u>

*Allen v. Tyson Foods, Inc*., 121 F.3d 642 (11th Cir. 1997) ............................ 2

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248,
      106 S.Ct. 2505 (1986)............................................................. 1

*Bailey v. Allgas, Inc*., 284 F.3d 1237 (11th Cir. 2002) ................................... 2, 40, 44,

*Boykins v. Lucent Tech., Inc.*, 78 F. Supp. 2d 402 (E.D. Pa. 2000)................. 37

*Burlington Northern & Santa Fe Railway Co. v. White,* --- U.S. ----,
      126 S. Ct. 2405 (2006)......................................................... 40, 44, 56

*Chapman v. AI Transport*, 229 F. 3d 1012, 1024-25 (11th Cir. 2000)
     (citing *Combs v. Plantation Patterns,* 106 F.3d 1519
     11th Cir. 1997) ...................................................................... 45

*Crapp v. City of Miami Beach,* 242 F.3d 1017
     (11th Cir. 2001) ..................................................................... 22

*Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232
     (11th Cir. 2001)...................................................................... 25, 26, 28, 29, 30

*Dent v. Federal Mogul Corp*., 129 F.Supp.2d 1311
     (N.D. Ala. 2001) .................................................................... 31, 48

*Doe v. Dekalb Co. School Dist.*, 145 F.3d 1441 (11th Cir. 1998) ................... 25

*Frederick v. Sprint/United Management Co.,*
     246 F.3d 1305 (11th Cir. 2001) ........................................... 44

*Gillis v. Ga. Dep't of Corr.,* 400 F.3d 883 (11th Cir. 2005) ............................ 22, 23, 46

*Gonzalez v. Florida Dept. of Highway Safety and Motor Vehicles Div*.,
     237 F.Supp.2d 1338 (S.D. Fla. 2002) ................................... 47

*Graham v. State Farm Mutual Insurance Co.,* 193 F.3d 1274
     (11th Cir. 1999) ..................................................................... 25

*Green v. Pittsburgh Plate & Glass Co.*, 224 F. Supp. 2d 1348
    (N.D. Ala. 2002) ..................................................................... 33

*Holifield v. Reno,* 115 F.3d 1555 (11th Cir. 1997) ........................................... 33, 40

*Knight v. Baptist Hospital of Miami, Inc.,*
    330 F.3d 1313 (11th Cir. 2003) ........................................... 30, 33, 37

*Lathem v. Dept. of Children and Youth Services*, 172 F.3d 786
    (11th Cir. 1999)..................................................................... 32, 39, 47, 48

*McCann v. Mobile County Personnel Board*, 2006 WL 1867486
    (S.D. Ala. 2006) ................................................................... 46

*McCoy v. Macon Water Auth.*, 966 F. Supp. 1209 (M.D. GA. 1997) .............. 37

*Silvera v. Orange County School Bd.*, 244 F.3d 1253 (11th Cir. 2001),
    *cert. denied*, 122 S.Ct. 402 (2001)......................................... 32, 33, 39

*Smith v. Alabama Dept. of Public Safety*,  64  F.Supp.2d 1215
    (M.D. Ala. 1999) ................................................................... 36

*Tarrance v. Montgomery County Bd. of Educ.*, 157 F.Supp.2d 1261
    (M.D. Ala. 2001) ................................................................... 36

*Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079 (11th Cir.2004)  .................... 23, 30


Statutes:

42 U.S.C.A. §1981 a(b)(3)............................................................. 55

Administrative Rules:

Rule 56(c), FED. R. CIV. P.  ............................................................. 1

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ELAINE M. COLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CASE NO: 2:06cv378-WKW** |
| | ) | |
| | ) | |
| **ALABAMA MEDICAID AGENCY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT ALABAMA MEDICAID AGENCY'S**
**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Alabama Medicaid Agency ("Medicaid"), respectfully moves the Court to grant summary judgment in Medicaid's favor with respect to all claims. Medicaid shows unto the Court, as set forth in this Memorandum, that there are no genuine issues of material fact and that Medicaid is entitled to judgment as a matter of law.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Rule 56(c), FED. R. CIV. P.   The fact that the parties do not agree on each and every fact is not significant; the law requires only that "there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 106 S.Ct. 2505 (1986). "'An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.' It is 'genuine' if the record

taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir. 1997) (internal citations omitted). "The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* at 646. (internal citations omitted).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Bailey v. Allgas, Inc*., 284 F.3d 1237, 1243 (11th Cir. 2002) (internal citations omitted). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' 'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (internal citations omitted).

## II.    SUMMARY OF THE ARGUMENT

Medicaid is entitled to summary judgment as a matter of law because it did not engage in any act of discrimination or retaliation against the Plaintiff. There is no evidence that the Plaintiff suffered any adverse employment action or that similarly situated employees were treated more favorably than the Plaintiff. There is no evidence that any action by Medicaid was harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination. In fact, all of Medicaid's actions that the Plaintiff complains about were actions taken pursuant to

normal operating procedures and had nothing whatsoever to do with the Plaintiff's race or complaints she made about alleged discrimination.

### III.    NARRATIVE STATEMENT OF UNDISPUTED FACTS[1]

#### A.  The Plaintiff's Job History with Medicaid

The Plaintiff, Elaine Coley, is an African American female  who was hired by Medicaid as an Administrative Support Assistant I ("ASA-I") on March 25, 2000. Compl. (Ex. A); Georgette Harvest Affidavit (Ex. B). On or about December 6, 2001, the Plaintiff's name first appeared on the State Personnel List of Certified Candidates for the position of Administrative Support Assistant II ("ASA-II"). Harvest Affidavit. No Medicaid employee is eligible for an ASA-II position following employment with Medicaid until his or her name appears on the State Personnel List of Certified Candidates (a "Register") for that position. *Id*. An employee is eligible for an ASA-II Register after he or she completes an application and passes an examination for that position. *Id*.  An employee is responsible for taking the test that qualifies him or her for placement on the Register. *Id*.

On or about December 29, 2001, Medicaid selected an ASA-II from those applicants on the Register. Harvest Affidavit. This was the first time Medicaid selected an ASA-II since the Plaintiff's name first appeared on the Register. *Id*. Medicaid did not select the Plaintiff for the position, but selected another African American female for the position. *Id*.  The second time the Plaintiff's name appeared on the State Personnel List of Certified Candidates for the position of ASA-II was February 20, 2002. *Id*. Medicaid appointed the Plaintiff from that Register to the position of ASA-II in Medicaid's

---

[1] Citation to the Plaintiff's allegations or testimony does not constitute an admission or concession by Medicaid of any fact or issue.

Elderly/Disabled Certification Division-Montgomery District Office effective March 23, 2002. *Id*. On or about February 22, 2003, the Plaintiff requested a lateral transfer as an ASA-II from the Elderly/Disabled Certification Division-Montgomery District Office to the Office of Policy Advisor. *Id*. Mary Finch and Linda Lackey were the Plaintiff's supervisor in the office of Policy Advisor. *Id*.

On or about July 14, 2004, the Plaintiff's name first appeared on the State Personnel List of Certified Candidates for the position of ASA-III with Medicaid. Harvest Affidavit. Medicaid did not select the Plaintiff for the position, but appointed another African American female to the position on September 7, 2004. *Id*.; P.'s Dep. at 195-196, 467 (Ex. C).

### B.  Memorandum to Personnel File and Appraisal

After receiving several counselings regarding her work performance, on or about June 30, 2003 the Plaintiff received a "Memorandum to Personnel File" ("Memorandum") from Linda Lackey through Mary Finch. Harvest Affidavit (Ex. B-4(b)). The Memorandum included eight areas and a plan of action for each area to assist the Plaintiff with corrective action. The eight areas included (1) "working hours and use of leave, breaks, lunch, and bank time," (2) "visitors, time away from desk," (3) "listening to and following instructions," (4) "signature folder, checking mail and routing of mail," (5) "performance and completion of assigned tasks, reviewing work before turning in to appropriate staff member," (6) "use of email system," (7) "efficiency with computer/programs," and (8) "use of project list." *Id*.

In summary, the Plaintiff was advised that she was "expected to follow established agency and division rules and to perform . . . assigned duties in a satisfactory

and timely manner." Memorandum (Ex. B-4(b)). If she was uncertain of her duties, the Plaintiff was instructed to let her supervisors know so that they could determine a solution. *Id*. The Memorandum was placed in the Plaintiff's personnel file and the Plaintiff was advised that her duties and performance would be monitored. *Id*. No disciplinary measures were taken, but the Plaintiff was warned that the next step would be a written reprimand if her performance did not improve. *Id*. The Plaintiff asked for a few days to review the Memorandum and on or about July 1, 2003, she refused to sign the Memorandum and stated that she would submit a rebuttal. *Id*. The Plaintiff never submitted a rebuttal. P.'s Dep. at 381.

The Plaintiff did not think she should be counseled in the Memorandum for not doing her work and not meeting deadlines because another employee, who was not an ASA-II, had offered to help her with a project, but the other employee's boss would not permit him to help the Plaintiff. P.'s Dep. at 309-310. Instead, the Plaintiff was required to do the work herself. *Id*. A few weeks later on July 25, 2003 Linda Lackey, as rating supervisor, and Mary Finch as Reviewing Supervisor, conducted an Employee Performance Appraisal of the Plaintiff's work. Appraisal-Harvest Affidavit (Ex. B-4(c)).

When the Plaintiff and Ms. Lackey discussed the Appraisal, the Plaintiff was concerned that her previous supervisor, Charles Shelnutt, had not provided input for the Appraisal since he had supervised her during a portion of the Appraisal period. P.'s Dep. at 151-152. Mr. Shelnut thereafter provided input for the Appraisal and the Plaintiff received a Meets Standards score. *Id*. at 154. However, the Plaintiff was not satisfied with the Meets Standards score because Ms. Lackey "had not looked up and did not know the

procedure" and the Plaintiff thought that if she had not known the procedure, Ms. Lackey would have given her a lower score. *Id*. at 155.

Despite the fact that the Plaintiff had been counseled numerous times regarding her work performance and received the Memorandum for eight areas of her job responsibilities only a few weeks prior to the Appraisal, Mr. Shelnutt's input resulted in the Plaintiff receiving an overall "Meets Standards" score of 17.70 on the Appraisal. *Id*. at 154; Harvest Affidavit (Ex. B-4(c)). Between the time of the Memorandum and the Appraisal, the Plaintiff experienced some improvement in her work but "by demeanor and raised voice, she . . . demonstrated an inappropriate attitude toward her current supervisor." *Id*.

The Plaintiff believes she was discriminated against on the basis of her race in this Appraisal. Compl. at ¶4(4); P.'s Dep. at 137. Ms. Lackey had talked to the Plaintiff prior to the Appraisal about not doing the work assigned to her and about her attitude. Harvest Affidavit (Ex. B- 2-3); P.'s Dep. at 143-144. The Plaintiff claims that "the discrimination part was . . . she [Ms. Lackey] didn't do anybody else like that. She never called anybody else in and accused them of not doing their work." P.'s Dep. at 141-142. The Plaintiff did not have any problems with Ms. Lackey between the time of the conversation and the time of the Appraisal and the Plaintiff agrees there is nothing wrong with a concerned supervisor asking her employee about potential problems. *Id*. at 149-151.

Because the Plaintiff received a Meets Standards score, she was supposed to receive a raise. P.'s Dep. at 156. Due to budgetary restrictions, the Plaintiff did not receive the raise. *Id*. at 156. However, this had nothing to do with the Plaintiff individually or with Medicaid and no one at Medicaid received a raise at that time. *Id*. at

156-157. The Plaintiff was also dissatisfied because she was graded on transcribing, but she had been told she would not have to transcribe as part of her job. *Id.* at 157-160. "However, the discrimination came in that I don't think any other employee had to go through that. There were other employees who were there besides myself, white employees, who did not have to go through that. . .Go through the procedure  that I had to go through with her to explain to her about my evaluation. . . They did not grade white employees on the same terms they graded me on. …" *Id.* at 161.

The Plaintiff specifically believes that white employees Robin Rawls, Pam Owens, Jean Stone, Myron Uptain and perhaps one more employee whose name and title the Plaintiff cannot remember, were graded more fairly than she was. *Id.* at 163-168. The Plaintiff has not seen any other employee's evaluation and does not know what is in those evaluations.[2] *Id.* at 161-162.  None of these employees held the same position as the Plaintiff or were evaluated on the same characteristics as the Plaintiff. *Id.* at 164-168.

Nevertheless, the Plaintiff believes the Appraisal, including the Memorandum, attached to it, "cost her promotional and advancement opportunities." P.'s Dep. at 169-170; Compl. at ¶(4)(4). The Plaintiff claims that after the Memorandum was placed in her personnel file, she was passed over for promotions to ASA-III at various state agencies thirty-two times, although she cannot recall the dates she was denied the promotions, at which state agencies, in what manner she was notified she was not hired for the ASA-III job or who was hired for the position. P.'s Dep. at 170-174, 176.  The only specific state agencies the Plaintiff can recall are "Mental Health, Transportation, the Department of ADECA and the Insurance Board." *Id.* at 171-172.

---

[2] The Plaintiff did not conduct discovery on this or  any other issue.

The Plaintiff believes she either received a letter from Mental Health or a phone call indicating she did not receive the promotion because of information found in her personnel file. P.'s Dep. at 179. However, she did not take any action once she received that phone call or letter. *Id.* The Plaintiff also recalls that she received a letter from Mr. Jeffery Brown at the Department of Transportation ("DOT") indicating she would not receive an ASA-III position at that department. *Id.* at 180-181. The Plaintiff does not have the letter, but thinks Mr. Brown said she would not receive the promotion because Mr. Brown did not believe the Plaintiff could perform the duties of the job based on information in her personnel file. *Id.* at 181-182.

The Plaintiff assumes Mr. Brown was referring to information in her personnel file from DOT and information in her personnel file from Medicaid. *Id.* at 182-183. However, he only said it was "information in her personnel file" and did not state what specific information he was referring to. *Id.* The Plaintiff was employed by DOT before she became a Medicaid employee. *Id.* She received a Memorandum on January 12, 2000 from her supervisor at DOT, Bonita Crosskno, which was described as an "official written reprimand" that became part of her personnel file. *Id;* Crosskno Memorandum-Harvest Affidavit (Ex. B-4(a)). Ms. Crosskno's Memorandum counseled the Plaintiff regarding her "work demeanor" and "difficulty with the rules and regulations" and indicated that "any further instances of this nature will result in an official recommendation for suspension." *Id.*

When the Plaintiff was not hired as an ASA-III by DOT, she "wrote some letters to Mr. Brown and to the Transportation Director" "that was just explaining to them the procedure that he -- he used." P.'s Dep. at 187-188. The Plaintiff thinks she also referred

them to other things that had nothing to do with Medicaid. *Id*. at 206.  The Plaintiff filed a grievance against DOT alleging that DOT committed race discrimination when it did not hire her for the ASA-III position. *Id*. at 400. An administrative law judge conducted a hearing on the Plaintiff's grievance and thereafter upheld DOT's hiring decision. *Id*. at 402.

The Plaintiff thinks that someone at Medicaid provided her personnel file to DOT. P.'s Dep. at 382-383. The Plaintiff does not know which rule forbids Medicaid from providing personnel files to another Department. *Id*. at 185-186. However, Medicaid's investigation of a Grievance filed by the Plaintiff found that there was no evidence that Medicaid provided its personnel files to another Department. Butler August 20, 2004 Memorandum to Herrmann-Butler Affidavit (Ex.D-7). State agencies obtain personnel files directly from the State Personnel Department. *Id*.;  Harvest Affidavit. The Plaintiff also believes she received a letter from ADECA indicating that she had been passed over for the ASA-III position because of information in her personnel file. P.'s Dep. at 191-192. The Plaintiff does not have the letter but knows that it did not specify what information in her personnel file ADECA relied upon. *Id*. at 192.  Similarly, the Plaintiff believes she received a letter or phone call or both from the Insurance Department indicating that she did not receive an ASA-III position because of information found in her personnel file, but like the other agencies the Insurance Department was not specific as to what information it used. *Id*. at 193-194.

The Plaintiff's name also appeared on a Register for an ASA-III position at Medicaid, but someone else was selected. P.'s Dep. at 195; Harvest Affidavit. The Plaintiff does not think she was denied this promotion because of information in her

personnel file. P.'s Dep. at 195-196. She thinks the agency simply decided to hire someone else. *Id*. An African American female was selected for that position. *Id*. at 467; Harvest Affidavit.

The Plaintiff believes that the instructions that were attached to her Appraisal should not have been placed in her personnel file so that other state agencies could see the instructions if she applied for a position with one of those agencies. P.'s Dep. at 184-187. The Plaintiff thinks that all that needs to be in the personnel file is the Appraisal. *Id*. The Plaintiff thinks "the rules may say that" but she cannot point to a specific rule. *Id*. at 187.

### C.  Plaintiff's July 20, 2004 Grievance
### And the Agency's Investigation

On July 20, 2004 the Plaintiff filed an Employee Grievance Form alleging race, color, and sex discrimination, that another Medicaid employee, Robin Rawls, assaulted her and that her "complaint" of March 16, 2004 had not been resolved. Employee Grievance Form-Butler Affidavit (Ex. D-1). Within the document, the Plaintiff also complained about the Memorandum prepared by Ms. Lackey and Ms. Finch. *Id*.  On July 22, 2004 Lee Maddox, Deputy Commissioner Administrative Service, interviewed the Plaintiff in response to the Grievance she filed two days before. Maddox July 22, 2004 Memorandum to Coley-Butler Affidavit (Ex. D-2); Maddox July 28, 2004 Memorandum for the Record-Butler Affidavit (Ex. D-5). Patricia Jones, who worked for Mr. Maddox, was also present.   *Id*.; P.'s Dep. at 356.   Mr. Maddox asked the Plaintiff for all information related to her allegations against Ms. Rawls, including witnesses. Butler Affidavit (Ex. D-2, 5).  The Plaintiff said that at that time, she would not provide the name of any witnesses. *Id*. The Plaintiff attempted to discuss the Memorandum placed in

her file by Ms. Finch and Ms. Lackey, but Mr. Maddox would not discuss that matter because the Grievance was about two alleged incidents with Ms. Rawls and the Plaintiff admitted that neither Ms. Finch nor Ms. Lackey were parties to the alleged incidents. *Id*. Mr. Maddox also refused to discuss the matter because the Memorandum is not a grievable issue under AIM 404. *Id*. The same day Mr. Maddox met with the Plaintiff, he sent a Memorandum to the Plaintiff and indicated that "it is of paramount importance that I have all information in my efforts to conduct an investigation on behalf of Commissioner Carol Herrmann." Butler Affidavit (Ex. D-2). As part of his investigation, Mr. Maddox also interviewed Ms. Rawls on July 26, 2004. Maddox July 26, 2004 Memorandum to File re Grievance Filed by Coley-Butler Affidavit (Ex.D-3). Ms. Rawls denied the Plaintiff's allegations that she touched the Plaintiff or blocked her way. *Id*. Ms. Rawls also told Mr. Maddox that there were two witnesses to the incident, who had prepared written documentation at the time of the incident. *Id*.

Mr. Maddox interviewed Tina Edwards on July 27, 2004. Maddox July 27, 2004 Memorandum-Butler Affidavit (Ex. D-4). Ms. Edwards recalled the incident and that she had provided written documentation to Mike Murphy at the time of the incident. *Id*. She also indicated that the Plaintiff was very upset and talking in a loud tone and that Ms. Rawls told the Plaintiff not to leave. *Id*. Ms. Edwards never saw Ms. Rawls touch the Plaintiff and never saw Ms. Rawls block the Plaintiff from leaving. *Id*.  Ms. Edwards then provided to Mr. Maddox the written account she had previously provided to Mr. Murphy. *Id*. The Plaintiff did not respond to Mr. Maddox's Memo requesting that the Plaintiff provide information to support her allegations. *Id*.; P.'s Dep. at 360.

On July 28, 2004 Mr. Maddox outlined his investigation of the Plaintiff's Grievance in a "Memorandum for the Record." Butler Affidavit (Ex. D-5). Mr. Maddox indicated that the Plaintiff was asked to provide witnesses who saw the alleged incident with Ms. Rawls and the Plaintiff refused. *Id*. Mr. Maddox also noted that the Plaintiff's request to remove documents from her personnel file is not a grievance issue in accordance with agency policy because her rating was "meets standards" and that Ms. Lackey and Ms. Finch were doing what was expected of them and they had a responsibility "to point out to the employee exactly what was needed in order to improve the rating from a partially meets standards to a meets-standards level." *Id*. He concluded that "therefore, Ms. Lackey, rating supervisor, and Ms. Finch, reviewing supervisor, were performing their duty and responsibility in accordance with agency policy and what is expected of employees in a leadership position." *Id*. The Plaintiff had a right to submit a rebuttal to the rating and request that the rebuttal be placed in her agency personnel file and State personnel file. *Id*. However, the Plaintiff did not submit a rebuttal. *Id.*; P.'s Dep. at 381.

Mr. Maddox also noted that he had reviewed the Plaintiff's "Memorandum and Request for Hearing Before a Grievance Committee" from the plaintiff to Commissioner Herrmann wherein the Plaintiff accused him of being unprofessional in his investigation of the Plaintiff's Grievance. Butler Affidavit (Ex. D-5). Mr. Maddox indicated that the Plaintiff's "assessment of the meeting of July 22 is totally inaccurate and without substance" and that one of the reasons he had a witness in that meeting was because he had dealt with the Plaintiff before and knew her to be belligerent and argumentative. *Id*.

On August 2, 2004 Ms. Rawls sent a Memorandum to Mr. Maddox as a follow up to their meeting on July 26. August 2, 2004 Rawls Memorandum-Butler Affidavit (Ex. D-6). Ms. Rawls denied "in the strongest terms possible that I have ever assaulted Elaine Coley on March 15, 2004 or any other date. As a result of the anger and aggression displayed by Ms. Coley, I felt I was the one in danger of physical attack." *Id*. She also indicated that since the incident, she had to avoid being alone with the Plaintiff or having conversation with her. *Id*. Because of the incident, Ms. Rawls no longer directly assigned work to the Plaintiff, but made all assignments through Ms. Rawl's supervisor Mike Murphy. *Id*. As part of her Memo, Ms. Rawls also provided her own statement related to the March 15, 2004 incident, along with the statements of two witnesses, Ms. Edwards and Ms. Owens. *Id*.

Because the Plaintiff accused Mr. Maddox of being unprofessional in his handling of her Grievance, Medicaid's General Counsel Bill Butler reviewed the Grievance and investigation related thereto. Butler Affidavit (Ex. D-7). Mr. Butler concluded that the investigation did not show an actionable grievance and did not justify the convening of a Grievance Hearing Panel. *Id*. The conclusion of the investigation was that there was no evidence to support the Plaintiff's allegations of assault and that if anything, discipline could have been initiated against the Plaintiff based on her conduct and actions toward Ms. Rawls. *Id*. Mr. Butler also concluded that Mr. Maddox was correct to limit his investigation to the alleged assault since a complaint related to an annual appraisal is not a grievable issue under AIM 404. *Id*. The Procedures specifically state that they do not apply to annual employee evaluations where the overall rating is "meets standards" or above. *Id*. Since the Plaintiff had also accused Medicaid of providing her CAP and other

materials to DOT, which she claims resulted in DOT not promoting her to ASA-III, Mr. Butler reviewed that issue as well. *Id*. He found no evidence that Medicaid provided any information to DOT. *Id*. He noted that the proper protocol followed by state agencies, is to obtain personnel information directly from State Personnel Department. *Id*.

On August 24, 2004 Commissioner Carol Herrmann wrote to the Plaintiff to advise that the investigation of the Plaintiff's Grievance did not warrant the convening of a grievance panel or other action by Medicaid. August 24, 2004 Letter from Herrmann to Coley–Butler Affidavit (Ex. D-8). Commissioner Herrmann further advised the Plaintiff that if she believed she had been treated unfairly or abusively, she could appeal under the merit system to the State Personnel Board or file a complaint with the EEOC. *Id*. The Plaintiff believes Commissioner Herrmann, "by virtue of her position" as the Commissioner was unfair "because she had the authority to do something about this and she just let it go on." P.'s Dep. at 313-314. The Plaintiff also believes that Commissioner Herrman was racially discriminatory because she did not speak to the Plaintiff personally in response to the Plaintiff's letters. P.'s Interrog. Resp. 10 (Ex. E). The Plaintiff thereafter filed a complaint with the EEOC. P.'s Dep. at 367. The Plaintiff was satisfied with the EEOC's investigation. *Id*.

> **D.     May 13, 2004 CAP and July 22, 2004 Appraisal
>     Conducted By Mike Murphy**

On July 22, 2004, Mike Murphy conducted an Appraisal of the Plaintiff's work covering the time period between November 1, 2003 and August 1, 2004. July 22, 2004 Appraisal-Harvest Affidavit (Ex. B-4(d), 5). The Appraisal is not a part of the Plaintiff's personnel file at Medicaid and neither the Appraisal nor the CAP are part of the Plaintiff's personnel file at the State Personnel Department. Harvest Affidavit. The

14

Plaintiff believes that this Appraisal was discriminatory. P.'s Dep. at 211. Specifically, the Plaintiff believes the timing of this Appraisal and the inclusion of a May 13, 2004 Corrective Action Plan ("CAP") dated May 13, 2004 is discriminatory. *Id*. at 220. The Plaintiff thinks that the CAP was "maliciously" included in the Appraisal "to sabotage her career" because she had complained of an incident with Ms. Rawls. *Id*. at 223-224.

The Plaintiff is also unhappy with the Appraisal because she claims she should have had a preappraisal when she transferred to another area within Medicaid, and then a six month appraisal and then a twelve month appraisal. *Id*. at 227-228. She thinks there is a rule requiring this procedure but does not know which rule it is. *Id*. Additionally, the Plaintiff believes the content of the CAP is discriminatory. P.'s Dep. at 230-231. Part of the CAP indicated that more than two late arrivals would result in additional corrective actions. *Id*. The Plaintiff thought that part was discriminatory because there were other employees, including Robin Rawls, working in the same section as the Plaintiff who were often late. *Id*. at 232. The Plaintiff thought that Ms. Rawls who held a supervisory position, left in the afternoons to pick up her daughter from school. *Id*. at 233. The Plaintiff was unhappy about Ms. Rawls being able to leave to pick up her daughter from school because she thought "supervisors have to follow procedures too." *Id*. The Plaintiff cannot specify what procedure she is referring to. *Id*. at 233-234. However, the Plaintiff admits she had been late for work in the past. *Id*. at 235. The Plaintiff "does not know of anybody who is going to come to work a whole year and not be late a couple of times." *Id*. at 232.

The Plaintiff also had a problem with the portion of the CAP that required her to let her supervisor know when she was leaving for break and when she returned from

break because she thought she was the only who had to report this information to her supervisor. *Id.* at 236-237. She thought that if she was going to be required to report this information to her own supervisor, Ms. Rawls should have to report the same information to her supervisor. *Id.* at 237. The CAP also noted that there had been occasions where Plaintiff did not follow instructions resulting in tasks not being completed correctly or in a timely manner. *Id.* at 241, CAP-Harvest Affidavit (Ex. B-4(d)). However, the Plaintiff also has a problem with this portion of the CAP because she is not aware of what occasions the CAP was referring to. P.'s Dep. at 241. The Plaintiff thought it was fair, though, that the CAP provided that additional corrective actions would be taken and reflected on her annual evaluation if tasks and assignments were not completed according to instructions. *Id.* at 244-245.

The Plaintiff takes issue with the CAP indicating that "more than two instances of work being turned in with errors, and/or not on time, will result in additional corrective actions being taken, including lowering of at least one rating on your annual evaluation." P.'s Dep. at 246. The Plaintiff "does not know of any typist who could probably turn those letters in without no typographical errors, one or two." *Id.* at 246-247. She also thinks it is unreasonable to expect her work to be error free. *Id.* at 247-248. Further, the Plaintiff is concerned that other employees may have access to the "Q drive" where the letters she has worked on are stored. *Id.* at 274. She is concerned that other employees may change her work, but she does not know whether that happened and does not know whether the letters referred to in the CAP are the letters stored on the Q drive. *Id.*

The CAP also required the Plaintiff to use a project list to help her stay on track and prioritize her work. Harvest Affidavit (Ex. B-4(d)). The Plaintiff objects to this

requirement because she asked a couple of other people, who did not hold the same position, if they had to provide a project list and they did not. P.'s Dep. at 253-254. The Plaintiff believes that certain rules, such as the one related to the project list, should apply to everyone. *Id*. at 255-256. Another portion of the CAP required the Plaintiff to send an e-mail to her supervisor each Friday describing the assignments she worked on during the week and their status. Harvest Affidavit (Ex. B-4(d)). Failure to follow this rule would result in a lowering of the Plaintiff's annual evaluation and additional corrective actions begin taken. *Id*. The Plaintiff does not have a problem with the e-mail requirement, but she does object to any discipline if she fails to provide the e-mail. P.'s Dep. at 257. Specifically she believes that if she gets busy and cannot send the e-mail if she is upstairs working on "some maps or something" and she does not get back down to write the e-mail, then she would have a problem with it. *Id*. at 257. Further, the Plaintiff is simply not willing to abide by any rules that are "set up for just her to go by." *Id*. at 258. Like the Memorandum prepared by Ms. Finch and Ms. Lackey, the Plaintiff objects to the CAP being placed in her personnel file because she thinks "instructions to an employee should not be placed in your personnel file." *Id*. at 261.

In addition to believing that the Appraisal conducted by Mike Murphy was discriminatory, the Plaintiff also believes it was done in retaliation for the Plaintiff complaining about an incident with Ms. Rawls. P.'s Dep. at 265. The Plaintiff believes this to be true because some of the duties listed on the CAP were not duties she performed. *Id*. at 266. She admits that Mr. Murphy wrote N/A, meaning not applicable, on three of the tasks and that he apparently did not evaluate her on those items. *Id*. at 267-268. The Plaintiff objects to being evaluated on establishing priorities for completion of a

17

division project because she says she never had to do that and never had to make decisions about what had to be done first. *Id*. at 268. She is also unhappy with the portion that refers to her serving as a secretary and administrative support, because it is just a title and does not state what she did or how she did it. *Id*. at 269. She also never really had files to establish and maintain, so she did not think she should be evaluated on that task. *Id*. at 269.

The Plaintiff also believes the Appraisal was done in retaliation for the Plaintiff complaining about the incident with Ms. Rawls because when the Plaintiff met with Mr. Murphy about the alleged incident, he told her that he could see why Ms. Rawls may be afraid. P.'s Dep. at 277-278. The Plaintiff asked Mr. Murphy what he meant and he said "by looking at her and by looking at you." *Id*. She wondered whether Mr. Murphy meant that Ms. Rawls might be afraid because the Plaintiff is black. *Id*. at 278-279. The Plaintiff did not ask him whether that is what he meant and Mr. Murphy did not say he was referring to her race. *Id*. at 279, 333.

The Plaintiff also believes Mr. Murphy retaliated against her when he performed the Appraisal because the Plaintiff told Deputy Commissioner, Lee Maddox, that she did not want to work for Mr. Murphy. P.'s Dep. at 279-281. Before she was transferred to Mr. Murphy's office, Mr. Maddox called her into his office and told her that Cathy Hall, Deputy Commissioner for the area, and Mike Murphy "felt like they were getting a problem employee." *Id*. at 280. When the Plaintiff heard the concerns of Ms. Hall and Mr. Murphy, she did not want to work for them. *Id*. at 280-281.

### E.  The Plaintiff's Other Claims

The Plaintiff also wanted to transfer to another location as an ASA-II so that she would not have to work near Robin Rawls. P.'s Dep. at 290-291. The Plaintiff discussed her wishes with Mr. Maddox, who told her he did not have anywhere else to put her as an ASA-II and he that he could not arbitrarily transfer her to another area, especially in light of the reorganization that was taking place at the time. *Id*. at 293-294; Butler Affidavit (Ex. D-5). At this time, the Plaintiff was already being transferred to another position pursuant to Agency reorganization. Harvest Affidavit (Ex. B).  The Plaintiff claims that "white employees have resigned because they did not like the department, only to be rehired and placed where they desired." P.'s Dep. at 286. The Plaintiff believes Paige Clark, a white nurse, did not like the area she was being sent to as part of the Agency move. *Id*. at 287-288. Ms. Clark quit her job and the Plaintiff believed Ms. Clark "didn't care if she lost her job or not." *Id*. at 286-288. The Plaintiff *thinks* Ms. Clark was rehired the next day into a position she wanted. *Id*.  A white employee named Dawn (the Plaintiff does not know Dawn's last name or position) requested during the Agency move that she be placed near a window and her request was granted. *Id*. at 289-290. While the Plaintiff admits that her request to move to another area and Dawn's request to move to a location near a window are different, the Plaintiff thinks her request should have been given more weight. *Id*. at 290.

The Plaintiff also interviewed for another ASA-II position during this time, but was not hired for the job because the position was upgraded to another position for which the Plaintiff was not qualified. P.'s Dep. at 291. The Plaintiff admits that the position upgrade meant that all ASA-II's were eliminated from consideration, not just her. *Id*. at

291-292. The Plaintiff also believes that two other unnamed employees, both ASA's, wanted to swap positions and were allowed to do that. *Id*. at 292. However, the Plaintiff did not ask for or want either of their positions. *Id*. at 292-293.

The Plaintiff also claims Kim Black, a white employee, was treated more favorably because *after* the Plaintiff was promoted from Medicaid, Ms. Black's position of ASA-III was moved into the location where the Plaintiff had been. P.'s Dep. at 433-434. The Plaintiff heard a rumor that Ms. Black had had problems working in the Commissioner's office, but she does not know why Ms. Black transferred into the office. *Id*. at 435.

The Plaintiff's supervisor had good reason for not transferring her just because she asked for a transfer. Butler Affidavit (Ex. D-5, 7). On or about January 21, 2005, the Plaintiff received a promotion to ASA-III at the Alabama Department of Industrial Relations and voluntarily resigned her employment with Medicaid. P.'s Dep. 434; Harvest Affidavit.

## IV.    SUMMARY OF THE PLAINTIFF'S CLAIMS

On or about December 14, 2004, the Plaintiff wrote a letter to the Equal Employment Opportunity Commission ("EEOC") and indicated that she was submitting a "Charge/Complaint" against Alabama Medicaid Agency and Medicaid employees Henry Davis and Lee Maddox. Attachment to Complaint (Ex. A). On August 11, 2005 the Plaintiff filed a charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination in employment based on her race. See Charge of Discrimination ("Charge") attached to Compl. (Ex. A). The Plaintiff alleged in

her Charge that she was "subjected to disparate terms and conditions of employment" since she was hired in that she received unfair evaluations which caused her to be denied pay increases and transfers to other departments. *Id*. The Plaintiff also complained that "White employees have resigned because they did not like a department, only to be rehired and placed where they desired." *Id*.

The Plaintiff attached to her Charge her letter to the EEOC dated December 14, 2004, a document dated August 27, 2003 and signed by the Plaintiff, a document dated March 16, 2004 and signed by the Plaintiff and a March 3, 2004 Memorandum-Request to Acquire Clerical Staff- Elaine Coley (ASA-II) from Felicia Barrow, Associate Director, Prior Approval Unit, Office of the Medical Director to Lee Maddox, Deputy Commission, Administrative Services through Mary McIntyre, Medical Director. *Id*. The EEOC issued a Dismissal and Notice or Rights on or about January 27, 2006 indicating that "it was unable to conclude that the information obtained establishes violations of the statutes." *Id*.

On April 26, 2006, the Plaintiff filed this action against Medicaid alleging "discrimination in performance appraisals costing plaintiff promotion & advancement opportunities" and "retaliation because of complaints made to human resources regarding harassment and disparate treatment." Compl. at ¶¶ 4(4), 6. The Plaintiff also alleged that "Defendant placed negative information in my personnel file as well." *Id*. The Plaintiff claimed that the alleged discrimination took place between March 2003 and January 24, 2005, when she left her job voluntarily. *Id.* at ¶¶ 5, 8. The Plaintiff attached to her Complaint her EEOC Charge, with its attachments. *Id*.

## V.    ARGUMENT

### A.  The Plaintiff Did Not Suffer Discrimination in Performance Appraisals Costing Her Promotional and Advancement Opportunities

The Plaintiff's first claim is set forth in paragraph 4(4) of her Complaint and alleges that she suffered "discrimination in performance appraisals costing plaintiff promotional & advancement opportunities" and that "Defendant placed negative information in my personnel file as well." Compl. at ¶ 4(4). As set forth below, the Plaintiff complains about a Memorandum, a Corrective Action Plan and two Appraisals, which she submits should not be part of her personnel file and because they were, she claims resulted in her not being promoted to other state agencies. The evidence shows, however, that the Plaintiff's supervisors conducted performance appraisals pursuant to Medicaid policies and procedures and the Plaintiff was not denied any promotional or advancement opportunity because of information properly placed in her personnel file. Summary judgment is therefore due to be granted in favor of Medicaid on these claims.

To "establish a claim of disparate treatment stemming from racial discrimination, the Plaintiff must show that:  (1) she is a member of a protected class;  (2) she was subject to an adverse employment action;  (3) her employer treated similarly-situated employees who were not members of her class more favorably; and (4) she was qualified for the job or job benefit at issue." *Gillis v. Ga. Dep't of Corr.,* 400 F.3d 883, 887 (11th Cir. 2005)(internal citations omitted).  The Plaintiff is an African American and at the time of the actions complained of, she had worked as an ASA-II for almost a year.[3] Compl.; Harvest Affidavit.

---

[3] *See Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir. 2001) ("where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." (quotation omitted)).

Therefore, in determining whether a genuine issue of material fact exists on the Plaintiff's claim of disparate treatment, the relevant inquiry is whether the Plaintiff was subject to an "adverse employment action," and, if so, whether a similarly situated non-protected employee was treated more favorably. *Gillis,* 400 F.3d 883, 887; *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004).   In this case, the Plaintiff cannot show that she was subject to an adverse employment action or that similarly situated white employees were treated more favorably.

### i.  The Memorandum and Appraisal  Performed by Finch and Lackey Were Not Discriminatory

### a. The Memorandum and Appraisal Were Not Adverse Employment Actions

The Plaintiff, after receiving several counselings regarding her work performance, received a "Memorandum to Personnel File"[4] (the "Memorandum") from her supervisors Linda Lackey and Mary Finch. Memorandum-Harvest Affidavit (Ex. B-4(a). The Memorandum was placed in the Plaintiff's personnel file and the Plaintiff was advised that her duties and performance would be monitored.[5] *Id.*   If the Plaintiff's performance did not improve, the Plaintiff was warned that the next step would be a written reprimand. *Id.*  The Plaintiff had a right to submit a rebuttal to the rating and request that

---

[4] The Memorandum included eight areas and a plan of action for each area to assist the Plaintiff with corrective action. The eight areas included (1) "working hours and use of leave, breaks, lunch, and bank time," (2) "visitors, time away from desk," (3) "listening to and following instructions," (4) "signature folder, checking mail and routing of mail," (5) "performance and completion of assigned tasks, reviewing work before turning in to appropriate staff member," (6) "use of email system," (7) "efficiency with computer/programs," and (8) "use of project list." Memorandum (Ex. B-4(a)).

[5] The Plaintiff's supervisors met with her and she was advised that she was "expected to follow established agency and division rules and to perform . . . assigned duties in a satisfactory and timely manner." Memorandum (Ex. B-4(a)). If she was uncertain of her duties, the Plaintiff was told to let her supervisors know so that they could determine a solution. *Id.*

the rebuttal be placed in her agency personnel file and State personnel file. P.'s Dep. at 381. However, the Plaintiff did not submit a rebuttal. *Id.*

A few weeks later on July 25, 2003, the Plaintiff's supervisors conducted an Appraisal of the Plaintiff's work. July 25, 2003 Appraisal-Harvest Affidavit (Ex. B-4(b)). Despite the fact that the Plaintiff had been counseled numerous times regarding her work performance and received the Memorandum regarding eight areas of her job responsibilities only a few weeks prior to the Appraisal, the Plaintiff received an overall "Meets Standards" score of 17.70 on the Appraisal. *Id.* This positive score would have entitled the Plaintiff to a raise if budgetary restrictions had not dictated otherwise. P.'s Dep. at 156. The Plaintiff admits that her not receiving a raise was a budgetary issue that had nothing to do with her individually or with Medicaid. *Id.* at 156-157. In fact, no one at Medicaid received a raise during that time period. *Id.*

Despite the positive score and lack of disciplinary measures, the Plaintiff claims that the Appraisal was discriminatory. Specifically, she claims it was discriminatory because when she and Ms. Lackey first discussed it, the Plaintiff was concerned that her previous supervisor, Charles Shelnutt, had not provided input for the Appraisal since he had supervised her during a portion of the Appraisal period. P.'s Dep. at 151-152. However, the Plaintiff admits that she brought her concern to Ms. Lackey's attention and Ms. Lackey then sought input from Mr. Shelnutt. *Id.* at 154. The Plaintiff was still not satisfied because Ms. Lackey "had not looked up and did not know the procedure" and the Plaintiff thought that if she had not known the procedure, Ms. Lackey *would have* given her a lower score. *Id.* at 154-155 (emphasis added).

24

The Plaintiff's speculation about what might have happened if her previous supervisor was not contacted regarding her Appraisal is hardly an adverse employment action. *See Graham v. State Farm Mutual Insurance Co.,* 193 F.3d 1274, 1283 (11th Cir. 1999) (per curiam) (holding that a counseling memo about plaintiff's improper absences and warning of *possible* ramifications "simply did not meet the 'threshold level of substantiality' required by the Eleventh Circuit in *Wideman*.") "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir. 2001) (internal citations omitted); *See also, Doe v. Dekalb Co. School Dist.*, 145 F.3d 1441, 1448-1449 (11th Cir. 1998) (noting that an objective test, rather than a subjective test, is used to determine whether an action is adverse).

The Plaintiff also did not think she should be counseled for not doing her work and not meeting deadlines because another employee Myron Uptain, who was not an ASA-II, had offered to help her with a project but the other employee's boss would not permit him to help the Plaintiff.  P.'s Dep. at 309-310. Instead, she was required to do the work herself. *Id*.  Requiring the Plaintiff to perform her own work does not constitute an adverse employment action under Title VII.   The rule of law is that to be adverse, an action must be serious and material, and the actions Plaintiff complains about were not. As stated by the Eleventh Circuit, "Congress simply did not intend for Title VII to be implicated where so comparatively little is at stake." *Davis,* 245 F.3d 1232, 1240.

In *Davis,* the Eleventh Circuit upheld the lower court's conclusion that negative job performance memoranda placed in employee's file did not result in any tangible

consequences in the form of loss of pay or benefits and the plaintiff therefore did not suffer any "adverse employment actions." *Davis* at 1240-1241.  The court pointed out that "criticisms of an employee's job performance-written or oral-that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit." *Id.* at 1241.

The Plaintiff's own testimony establishes that the Memorandum and Appraisal did not lead to tangible job consequences. Her own testimony was that the Memorandum was only "instructional" and even after the Memorandum, she received a "meets standards" score on her Appraisal.  P.'s Dep. at 154, 169, 197. She also admits that there is nothing wrong with a concerned supervisor asking her employee about potential problems as her supervisors did when they met with her about the Memorandum. *Id.* at 150-151.

In meeting with the Plaintiff, discussing her job performance and providing a written plan as to how she could improve her performance, her supervisors were doing what was expected and required of them as Medicaid supervisors. Butler Affidavit (Ex. D-5, 7).  In fact, they had a responsibility "to point out to the employee exactly what was needed in order to improve the rating from a partially meets standards to a meets-standards level." *Id.*

### b. The Memorandum and Appraisal Did Not Cost the Plaintiff Promotional and Advancement Opportunities

In addition to claiming that the contents of the Memorandum and Appraisal by Ms. Finch and Lackey were discriminatory, the Plaintiff claims that they cost her promotional and advancement opportunities with other state agencies.[6] Compl. at ¶4(4);

---

[6] The Plaintiff makes these same claims about a CAP and Appraisal performed by Mike Murphy.

P.'s Dep. at 169, 184-187. Like her other claims, the Plaintiff cannot support these claims with any evidence. The Plaintiff specifically asserts that the Memorandum should not have been placed in her personnel file so that other state agencies could see the instructions if she applied for a position with one of those agencies. P.'s Dep. at 184-187. The Plaintiff thinks that all that needs to be in the personnel file is the Appraisal. *Id*. at 186-187. However, the Plaintiff cannot point to any rule that prevents such information from being placed in a personnel file. *Id*. at 187.  No such rules exist and the Plaintiff's supervisors were simply doing their jobs when they put the CAP and Appraisal in her personnel file. Butler Affidavit (Ex. D-5, 7).

The Plaintiff claims that after the first Memorandum was placed in her personnel file, she was passed over for promotions to ASA-III at various state agencies thirty-two times.[7] P.'s Dep. at 170. The Plaintiff cannot recall the dates she was denied the promotions at which state agencies, in what manner she was notified she was not hired for the ASA-III jobs, or who was hired for the positions. *Id*. at 170-174, 176. The only specific state agencies she can recall are "Mental Health, Transportation, the Department of ADECA and the Insurance Board." *Id*. at 171-172.

The Plaintiff believes she either received a letter from Mental Health or a phone call indicating she did not receive the promotion because of information found in her personnel file. P.'s Dep. at 179. However, she admits she does not know what information they were referring to and she did not take any action once she received that

---

[7] The Plaintiff admits that Medicaid, the only Defendant in this case, did not deny her any promotional or advancement opportunities. See P.'s Dep. at 195-196 (Plaintiff testified that when her name appeared on a Register for an ASA-III position at Medicaid, someone else was selected but she does not think she was denied this promotion because of information in her personnel file. She thinks the agency simply decided to hire someone else and in fact, that person was an African American female). Rather, the Plaintiff seeks to hold Medicaid responsible for the alleged decisions of other state agencies.

phone call or letter. *Id*. The Plaintiff also recalls that she received a letter from Mr. Jeffery Brown at the Department of Transportation ("DOT") indicating she would not receive an ASA-III position at that department.[8] *Id*. at 180-181. The Plaintiff does not have the letter but recalls that Mr. Brown said the Plaintiff would not receive the promotion because he did not believe she could perform the duties of the job based on information in her personnel file. *Id*. at 181-182. The Plaintiff assumes Mr. Brown was referring to information in her personnel file from her previous employment with DOT[9] and information in her personnel file from Medicaid. *Id*. at 182-183. However, Mr. Brown only said it was "information in her personnel file" and did not state what specific information he was referring to. *Id*. These assumptions do not amount to evidence that DOT failed to hire because of the Memorandum, Appraisals or CAP. See *Davis*, 245 F.3d 1232, 1239 ("[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.").

The Plaintiff also believes she received a letter from ADECA indicating that she had been passed over for the ASA-III position because of information in her personnel file. P.'s Dep. at 191-192. The Plaintiff does not have the letter but admits that it did not specify what information in her personnel file ADECA relied upon. *Id*. at 192. Similarly, the Plaintiff believes she received a letter or phone call or both from the Insurance Department indicating that she did not receive the ASA-III position because of

---

[8] The Plaintiff filed a grievance against DOT alleging that DOT committed race discrimination when it did not hire her. P.'s Dep. at 400. An administrative law judge conducted a hearing on the Plaintiff's grievance and thereafter upheld DOT's hiring decision. *Id*. at 402.

[9] The Plaintiff had received a Memorandum on January 12, 2000 from her supervisor at DOT, Bonita Crosskno, which was described as an "official written reprimand" that became part of her personnel file. *Id*; Crosskno Memorandum-Harvest Affidavit (Ex. B-4(a)). Ms. Crosskno's Memorandum counseled the Plaintiff regarding her "work demeanor" and "difficulty with the rules and regulations" and indicated that "any further instances of this nature will result in an official recommendation for suspension." *Id*.

information found in her personnel file, but like the other agencies the Insurance Department was not specific as to what information they used in making their decision. *Id*. at 194.

All of the Plaintiff's allegations about other state agencies relying on information in the Plaintiff's personnel file are too vague to indicate the Plaintiff was not hired by other agencies because of the Memorandum and Appraisals. The Eleventh Circuit has recognized that:

> [a]ny job criticism or negative job review carries with it the possibility that the employee's future prospects may be prejudiced if that information is disclosed. A negative evaluation that otherwise would not be actionable will rarely, if ever, become actionable merely because the employee comes forward with evidence that his future prospects have been or will be hindered as a result**.** *Davis* at 1243.

Notably, the information in her personnel file did not prevent her from being promoting from Medicaid to another state agency in January 2005. Harvest Affidavit; P.'s Dep. at 434. Further, the Plaintiff here has not come forward with any "evidence" that her future prospects were hindered as a result of the Memorandum, CAP and Appraisals in her personnel file.

"[N]ot all conduct by an employer negatively affecting an employee constitutes adverse employment action" and "[a]lthough the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Davis,* 245 F.3d 1232, 1238-1239. Accordingly "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* (emphasis in original).

For example, where an employer's allegedly unfounded criticism of an employee's job performance, in the form of job performance memoranda or otherwise,

does not constitute a formal reprimand or trigger any tangible form of adverse action such as loss in benefits, ineligibility for promotional opportunities or more formal discipline, such criticism is rarely actionable under Title VII. *Davis* at 1242. Even if the Plaintiff could show that the Memorandum and Appraisal placed in her file constituted adverse employment actions, and she cannot, summary judgment is still proper because the Plaintiff cannot show that she was treated less favorably than any similarly situated employee outside of her protected class.

### c. The Plaintiff Does Not Allege, Much Less Prove, That Similarly Situated Employees Were Treated More Favorably

The Plaintiff vaguely claims that Medicaid treated other employees more favorably than she was treated. She does not even allege, much less present any evidence, that these employees are similarly situated to her. She also does not allege that these employees engaged in similar misconduct but were treated more favorably. Her allegations, or lack thereof, are fatal to her claim. "To show that employees are similarly situated, the plaintiff must show that the 'employees are similarly situated in all relevant respects.'" *Knight v. Baptist Hospital of Miami, Inc.,* 330 F.3d 1313, 1316 (11th Cir. 2003) (quotation omitted). Indeed, "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson,* 376 F.3d at 1091 (internal citation omitted).

The Plaintiff's first claim that other employees were treated more favorably relates to Ms. Lackey talking to the Plaintiff (prior to the Appraisal) about not doing the work assigned to her and about her attitude. P.'s Dep. at 141, 143-144. The Plaintiff claims that "the discrimination part was . . . she [Ms. Lackey] didn't do anybody else like that. She never called anybody else in and accused them of not doing their work." *Id.* at

141-142.  The Plaintiff admits that she does not know the contents of other employee's appraisals or personnel files, so she does not know whether they had a Memorandum or a similar appraisal. *Id.* at 161-162 ("Q: Did you see their evaluations, Ms. Coley? A: Of course not.  Q: So, how do you know what was in them? A: I don't know what was in them. Q: Did you participate in those meetings with those employees and their supervisors? A: I wouldn't have any reason to."); *See also*, *Id.* at 163 (testifying that "I didn't see their performance appraisals").  Unnamed coemployees do not satisfy the standard set forth for establishing a similarly situated employee. *See, Dent v. Federal Mogul Corp.*, 129 F.Supp.2d 1311, 1314 (N.D. Ala. 2001 ) (finding that the plaintiff failed to establish a prima facie case of disparate treatment where the plaintiff failed to identify by name an employee of another race or gender who was both treated more favorably than and "similarly situated" to him). Here, the Plaintiff cannot even identify the other employees, much less establish that they were accused of not doing the work assigned to them.

In addition to the unnamed employees identified as comparators by the Plaintiff, the Plaintiff also alleges that certain white employees were graded more fairly than she was: Robin Rawls (a supervisor), Pam Owens (a nurse), Jean Stone (a nurse), Myron Uptain (who is not an ASA but whose title the Plaintiff does not know) and perhaps one more employee who was not an ASA, but whose name and title the Plaintiff cannot

remember.[10] P.'s Dep. at 163-166. The Plaintiff explained how these employees were treated more fairly as follows:

> Well, the discrimination came in that I don't think any other employee had to go through that. There were other employees who were there besides myself, white employees, who did not have to go through that. . .Go through the procedure  that I had to go through with her to explain to her about my evaluation. . . They did not grade white employees on the same terms they graded me on…Well, to my knowledge, nobody was given any -- nobody was given any -- nobody was given any -- any reason to be upset by –about the evaluations.  P.'s Dep. at 161.

While the Plaintiff complains that the alleged racial discrimination is that these other employees were not graded on the same terms she was, she freely admits that none of these employees held the same position that she held, performed the same duties she performed or were evaluated on the same characteristics on which she was evaluated. *See* P.'s Dep. at 164-168.  Her testimony is that these so called comparators held different jobs, so they were evaluated on different characteristics. *Id*. Her testimony is that these people were not similarly situated. *Id*. To be comparable, the comparators must be "similarly situated in all relevant respects to the non-minority employee." *Silvera v. Orange County School Bd*., 244 F.3d 1253, 1259 (11th Cir. 2001), *cert. denied*, 122 S.Ct. 402 (2001) (internal citations omitted). This means that an appropriate comparator must have operated under the same work place rules or policies. *Lathem v. Dept. of Children and Youth Services*, 172 F.3d 786, 793 (11th Cir. 1999).  Since the Plaintiff admits the

---

[10] The Plaintiff also claims that Christa Sanders, a white nurse, was treated more favorably, because Ms. Sanders "had some problems with some time or something that they were having done in that section, about the time." P.'s Dep. at  439-441. The Plaintiff thinks that Ms. Sanders "had had some prior problems with some things" and "they had gotten her some help."  *Id*. at 442. However, this is not the type of the assistance the Plaintiff wanted, nor did she request this type of assistance. *Id*. at 442. Rather, she thought "if they figure I was having problems with my job performance, they should have offered me some help, or they should have allowed me to get the training that was offered." *Id*. at 442-443.  The Plaintiff admits that Ms Sanders is a nurse, not an ASA-II. *Id*. at 439. There is no allegation that Ms. Sanders was counseled for the same problems the Plaintiff had with her job performance.

alleged comparators were graded on characteristics other than those upon which she was graded, she cannot establish this element of her prima facie case.

Another factor in determining whether comparators are similarly situated to the plaintiff is whether their misconduct is like that of the plaintiff's misconduct. *Knight,* 330 F.3d 1313; *Silvera,* 244 F.3d 1253, 1259; *See also Green v. Pittsburgh Plate & Glass Co.,* 224 F.Supp. 2d 1348, 1364 (N.D. Ala. 2002) (holding "we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second guessing employers' reasonable decisions and confusing apples with oranges."). Absent from the Plaintiff's allegations is that these other employees were accused of engaging in the same misconduct-failing to perform their work and having attitude problems. The Plaintiff bears the responsibility of establishing that she and the alleged comparator employees are similarly situated in all relevant respects. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997). The Plaintiff cannot establish a prima facie case of disparate treatment unless she can establish that another similarly-situated person engaged in nearly identical conduct and was treated more favorably. The Plaintiff has not done that in this case and cannot therefore establish a prima facie case of disparate treatment.

### ii.  The Corrective Action Plan and Appraisal by Murphy Were Not Discriminatory or Retaliatory

### a. The Corrective Action Plan and Appraisal Were Not Adverse Employment Actions

The Plaintiff claims that another Appraisal conducted on July 22, 2004 by her then supervisor, Mike Murphy, which included a May 13, 2004 Corrective Action Plan

("CAP") was also discriminatory.[11] Compl. At ¶4(4); P.'s Dep. at 211. The Appraisal covered the time period between November 1, 2003 and August 1, 2004. CAP and Appraisal-Harvest Affidavit (Ex. B-4(d), 5). The Appraisal is not a part of the Plaintiff's personnel file at Medicaid and neither the Appraisal nor the CAP are part of the Plaintiff's personnel file at the State Personnel Department. Harvest Affidavit (Ex. B). All of the Plaintiff's allegations regarding this CAP and Appraisal amount to a claim that she should not be required to follow any rule unless every other employee, no matter their status in the chain of command, is required to follow the same rules. This is not the sort of claim that is actionable under Title VII and as set forth below, has nothing whatsoever to do with the Plaintiff's race.

Specifically, the Plaintiff contends that the content of the May 13, 2004 CAP is discriminatory. P.'s Dep. at 230-231. Part of the CAP indicated that more than two late arrivals would result in additional corrective actions. Harvest Affidavit (Ex. B-4(d)). The Plaintiff does not deny that she had been late to work before. P.'s Dep. at 235. She "does not know of anybody who is going to come to work a whole year and not be late a couple of times." *Id.* at 232. Requiring the Plaintiff, who admits she had been late to work before, to report to work on time to avoid discipline, is not an adverse employment action. The CAP also noted that there had been occasions where Plaintiff did not follow instructions resulting in tasks not being completed correctly or in a timely manner. Harvest Affidavit (Ex. B-4(d)). The Plaintiff objects to this statement because she is not aware of what occasions the CAP was referring to. P.'s Dep. at 241. The Plaintiff thought

---

[11] The Appraisal itself indicates that an Interim Appraisal was conducted on May 13, 2004 and it contained two attachments, the first "describing area (s) of the employee's performance that need improvement as observed during the first nine months of the appraisal period," and the second, the CAP the Plaintiff complains about, which is dated and signed by the Plaintiff on May 13, 2004.

it was fair, though, that the CAP provided that additional corrective actions would be taken and reflected on her annual evaluation if tasks and assignments were not completed according to instructions. *Id*. at 244-245.

Although the Plaintiff does not claim to have error free work, she thinks it is discriminatory that the CAP provided that "more than two instances of work being turned in with errors, and/or not on time, will result in additional corrective actions being taken, including lowering of at least one rating on your annual evaluation." P.'s Dep. at 246. The Plaintiff "does not know of any typist who could probably turn those letters in without no typographical errors, one or two." *Id*. at 246-247. She also thinks it is unreasonable to expect her work to be error free. *Id*. at 247-248.

Another portion of the CAP required the Plaintiff to send an e-mail to her supervisor each Friday describing the assignments she worked on during the week and their status. Harvest Affidavit (Ex. B-4(d)). Failure to follow this rule would result in a lowering of the Plaintiff's annual evaluation and additional corrective actions begin taken. *Id*. The Plaintiff does not have a problem with the e-mail requirement, but she does object to any discipline if she fails to provide the e-mail. P.'s Dep. at 257. Specifically she believes that if she gets busy and cannot send the e-mail if she is upstairs working on "some maps or something" and she does not get back down to write the e-mail, then she would have a problem with. *Id*. at 257. Further, the Plaintiff is simply not willing to abide by any rules that are "set up for just her to go by." *Id*. at 258.

As with the Plaintiff's complaints about the Memorandum and Appraisal conducted by Ms. Finch and Ms. Lackey, her complaints about Mr. Murphy's CAP and Appraisal are complaints that she should not be disciplined *in the future* if she fails to

follow the rules set forth in the CAP and Appraisal. The Plaintiff agrees with the majority of the comments in the CAP and Appraisal, but she does not agree with the majority of the consequences if she fails to follow the rules. She also does not deny that she had been late for work, had not turned her work in on time and had turned in her work with errors. The only reason she had a problem with e-mailing her supervisor about the status of her work was because she thought every other employee should have to do that if she was going to be required to. None of the comments on the CAP or Appraisal regarding the Plaintiff's admitted infractions amount to adverse employment actions. These things simply to do not rise to the level of a serious and material change in the terms, conditions or privileges of employment as required to establish an adverse employment action. *Davis*, 245 F. 3d 1232, 1239. "Moreover, the mere fact that an employee dislikes his or her employer's action is not sufficient to establish the element of adverse employment action required in employment discrimination cases. Otherwise, every 'minor or even trivial employment action' would constitute grounds for a discrimination suit." *Smith v. Alabama Dept. of Public Safety*, 64 F.Supp.2d 1215, 1221 (M.D. Ala. 1999) (internal citations omitted). Further, "Employers have the freedom to make unwise, unsound, or even irrational decisions, and courts do not sit as super-personnel boards." *Tarrance v. Montgomery County Bd. of Educ.*, 157 F.Supp.2d 1261, 1263 -1264 (M.D. Ala. 2001) (internal citations omitted).

In addition to claiming that the CAP and Appraisal were discriminatory in their content, the Plaintiff also claims that the inclusion of these documents in her personnel file cost her "promotional and advancement opportunities" with other state agencies. Compl. at ¶4(4). The CAP and Appraisal are not even in the Plaintiff's personnel file at the State Personnel Department. Harvest Affidavit. However, the Plaintiff testified that

the promotional and advancement opportunities she is referring to in her Complaint are the same ones she claims she was denied as a result of the Memorandum and Appraisal conducted by Ms. Finch and Ms. Lackey. P.'s Dep. at 471. To the extent that the Plaintiff claims that information that was not even in her personnel file could be used against her to deny her promotions and advancement opportunities, Medicaid adopts by reference as if fully set forth herein its discussion of those claims at Sec. V(A)(i)(b) of this Memorandum.

### b. Similarly Situated Employees Were Not Treated More Favorably

As set forth above, to establish one of the elements of her claim that she was subject to disparate treatment, the Plaintiff must show that other non minority employees are similarly situated in all relevant respects but were not subject to the same treatment she received. *Knight,* 330 F.3d 1313, 1316. The Plaintiff alleges that a requirement in the CAP that she report to work on time was discriminatory because the Plaintiff believed that there were other employees working in the same section as the Plaintiff who were often late.[12] P.s' Dep. at 232. The only specific allegation about another employee relates to Robin Rawls.

The Plaintiff alleges that "Ms. [Robin] Rawls constantly abused the leave policy most afternoons to pick up her younger daughter from school and return to work without using annual leave. I was not allowed that opportunity." P.'s Interrog. Resp. 4; P.'s Dep.

---

[12] The Plaintiff similarly objects to the portion of the CAP that required her to let her supervisor know when she was leaving for break and when she returned from break because she thought she was the only who had to report this information to her supervisor. P.'s Dep. at 236-237. She thought that if she was going to be required to report this information to her own supervisor, Ms. Rawls should have to report the same information to her supervisor. *Id.* at 237. Close monitoring of employees is not an adverse employment action, however. *See*, *McCoy v. Macon Water Auth.,* 966 F.Supp. 1209, 1221 (M.D. GA 1997) ("It is not harassment for supervisors to monitor the performance of their employees . . ."); *Boykins v. Lucent Tech.,* Inc., 78 F.Supp.2d 402, 414 (E.D. Pa. 2000) ("[S]imply being observed at work, without more, does not rise to the level of an adverse employment action.").

at 232-233. The Plaintiff is quick to point out, however, that she was the time keeper and reported to Ms. Rawls' supervisor instances of Ms. Rawls not properly turning in her leave time. P.'s Dep. at 450-452. The Plaintiff admits that she does not know what happened after she advised Ms. Rawls' supervisor that Ms. Rawls was leaving work. *See* P.'s Dep. at 450-451 (Indicating that the Plaintiff knows "they had a couple of meetings with her [Ms. Rawls] about it" and but she *does not know* the outcome).  Even assuming leaving to pick up a child from school is the same as reporting to work on time, the Plaintiff admits that she does not know the outcome of the meetings between Ms. Rawls and her supervisor. *Id*. The Plaintiff was not disciplined for being late, she was only warned that she would be disciplined if she did not start reporting to work on time.  P.'s Dep. at 229-231; *See also*, CAP-Harvest Affidavit (Ex. B-4(d)).

Although the Plaintiff claims she was not "given the opportunity" to leave like Ms. Rawls did, the Plaintiff admits that she did not need to leave work to pick up a child at school nor did she make any such request. P.'s Dep. at  451. Further, the CAP specifically provided that if the Plaintiff needed to change her working hours, she could notify her supervisor and her hours would be changed if possible. P.'s Dep. at 230; Harvest Affidavit (Ex. B-4(d)).  Not surprisingly, the Plaintiff did not have a problem with that part of the CAP. P.'s Dep. at 230.  She did, however, think that Ms. Rawls should not be allowed to pick up her daughter from school because she thought "supervisors have to follow procedures too." *Id.* at 233.  The Plaintiff does not allege that Ms. Rawls is a similarly situated employee and she in fact held a supervisory position and was not an ASA like the Plaintiff. *Id*. at 233.

Additionally, to be comparable, Ms. Rawls' conduct must be "similarly situated in all relevant respects" to the Plaintiff. *Silvera*, 244 F.3d 1253, 1259 (internal citations omitted). That means Ms. Rawls' conduct must be "nearly identical" to the Plaintiff's conduct so that courts will not second guess an employer's reasonable decisions. *Id*. The Plaintiff's claims about Ms. Rawls have nothing to do with Ms. Rawls being tardy. Even if being tardy was the same as being able to leave to pick a child during the work day, "[i]f two employees are not 'similarly situated,' the different application of workplace rules does not constitute illegal discrimination." *Lathem,* 172 F.3d 786, 793. Again, the Plaintiff admits that Ms. Rawls was not an ASA and in fact held a supervisory position. P.'s Dep. at 233.

The CAP also required the Plaintiff to use a project list to help her stay on track and prioritize her work. Harvest Affidavit (Ex. B-4(d)). The Plaintiff objects to this requirement because she asked a couple of other [unnamed] people, who did not hold the same position that she held, if they had to provide a project list and they did not. P.'s Dep. at 253-254. The Plaintiff believes that certain rules, such as the one related to the project list, should apply to everyone if they are going to apply to her. *Id*. at 255-256. This allegation about unnamed employees does not meet the requirements of establishing an employee "similarly situated in *all relevant aspects." Silvera,* 244 F.3d at 1259; *See also*, *Lathem,* 172 F.3d 786, 707 (indicating that to be proper, a comparator must have operated under the same work place rules or policies as the plaintiff). The Plaintiff cannot even name these other employees much less establish that they operated under the same work place rules or policies. The Plaintiff's difficulty here is simply another instance of her not wanting to follow rules that do not apply to everyone at Medicaid.

### c.  Murphy's Actions Were Not Retaliatory

The Plaintiff claims that Mr. Murphy retaliated against her by doing two things: (1) grading her in her July 2004 Appraisal on items she did not perform and including a previously written CAP in her Appraisal and (2) making comments to her that she considered offensive. P.'s Dep. at 265, 277-278. The Plaintiff believes Mr. Murphy retaliated against her for two reasons: (1) because she had complained to personnel about two incidents with another employee, Robin Rawls and (2) because she believed Mr. Murphy did not want her as an employee to begin with. *Id*. at 265, 275, 277-278, 280.

To establish that Medicaid's actions were retaliatory, the Plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was some causal relationship between the two events. *Holifield v. Reno,* 115 F.3d 1555, 1566.  The Supreme Court recently defined an adverse employment action for purposes of establishing a retaliation claim as "an action by an employer that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White,* --- U.S. ----, 126 S.Ct. 2405, 2409 (2006).  "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. . ." *White* at  2407.

Assuming solely for purposes of summary judgment that the Plaintiff's complaints about incidents with another employee constituted a "statutorily protected expression," the Plaintiff must also show that she suffered an adverse employment action as defined in  *White* and that there was some causal relationship between the two events. The Plaintiff claims the May 2004 CAP was "maliciously" included in the Appraisal "to

40

sabotage her career" because she had complained of an incident with another employee, Robin Rawls. P.'s Dep. at 223-224, 265. As set forth above, the Plaintiff objected to the CAP not because of its comments about her work performance but because of discipline that *could be* imposed in the future if she failed to follow the guidelines set forth in the CAP and because it did not apply to all Medicaid employees. *See* P.'s Dep. 230-231 (arriving on time for work), 241, 244-245 (following instructions), 246 (errors in work), 256-257 (e-mailing status report to supervisor).

The CAP did not impose any disciplinary measures, it only warned of discipline that would occur in the future if the Plaintiff's work performance did not improve in these specific areas. Harvest Affidavit (Ex. B-4(d)). The Plaintiff only objected to it because she thought she should only have to abide by rules that every other Medicaid employee was required to follow, regardless of job title and responsibilities. *See* P.'s Dep. at 258-259 (testifying that "I'm willing to abide by the same guidelines as any other employee, not specific rules you have set up just for me to go by . . . if you ask me for a project list, I think that you should ask the nurse for a project list"). The complained of conduct is not the sort of conduct that a reasonable employee would find objectionable and would cause them to be dissuaded from making or supporting a charge of discrimination. In fact a reasonable employee would welcome the opportunity to correct problems in her employment before discipline was imposed. That is precisely the opportunity the Plaintiff's supervisor provided. Further, it is not reasonable that an employer be required to apply work rules across the board to all employees no matter their position as the Plaintiff alleges.

The Plaintiff also contends that a portion of her 2004 Appraisal was retaliatory because some of the duties listed were not duties she performed. P.'s Dep. at 266. She admits that Mr. Murphy wrote N/A, meaning not applicable, on three of the tasks and that he apparently did not evaluate her on those items. *Id*. at 267-268. However, she also objects to being evaluated on three other responsibilities she claims were not applicable to her. *Id*. The Plaintiff received a "meets standard" score for two of the three items she objects to. 2004 Appraisal-Harvest Affidavit (Ex. B-5).  Regarding the first one, the Plaintiff does not like the reference to her serving as a "secretary and administrative support," because it is "just a title" and does not state what she did or how she did it. P.'s Dep. at 269. She admits that the position of an administrative support assistant involves secretarial duties. P.'s Dep. at 51. The Plaintiff received a "meet standards" score on performing her secretarial and administrate duties. Harvest Affidavit (Ex. B-5).  A reasonable employee would not object to a "meets standards" score on an individual item in an Appraisal.

On the second item, "establishes and maintains files" the Plaintiff complains that she "never really had files to establish and maintain," so she did not think she should be evaluated on that task. P.'s Dep. at 269. The Plaintiff received a "meets standard" score on this task as well. 2004 Appraisal-Harvest Affidavit (Ex. B-5). On the third item, the Plaintiff objects to being evaluated on "establishing priorities for completion of div. projects" because she says she never had to do that and never had to make decisions

about what had to be done first.[13]  P.'s Dep.  at 268. Surely the Plaintiff does not claim an

ASA with her years of experience is not required to prioritize tasks. *See* P.'s Dep. at 50-

55, 64-65 (indicating that she had worked as an ASA performing secretarial duties for the

Department of Corrections as far back as 1994 and has since worked as an ASA at other

state agencies).   In addition to the fact that the Plaintiff received a "meets standards"

score on two of the three items in her Appraisal that she is complaining about, her

Appraisal indicates that no disciplinary measures were taken against her. 2004 Appraisal-

Harvest Affidavit (Ex. B-4(d)).

The Plaintiff also believes the 2004 Appraisal conducted by Mr. Murphy was

done in retaliation for the Plaintiff complaining about the incidents with Ms. Rawls

because when the Plaintiff met with Mr. Murphy about the alleged incident [not about the

Appraisal], he told the Plaintiff that he could see why Ms. Rawls may be afraid. P.'s Dep.

at 277-278. The Plaintiff asked Mr. Murphy what he meant and she claims that he said

"by looking at her and by looking at you." *Id*. at 277-278. She wondered whether Mr.

Murphy meant that Ms. Rawls might be afraid because the Plaintiff is African American.

*Id*. at 278-279. The Plaintiff did not ask him whether that is what he meant and the

Plaintiff admits that Mr. Murphy did not say he was referring to her race. *Id*. at 279, 333.

Two scores of "meets standards" and a single score below a "meets standards,"

with only warnings about *future* discipline if the Plaintiff failed to improve, and a single

---

[13] The Plaintiff also testified that her work as an ASA is very busy and that her previous supervisors gave her so much work she could not get it all done. P.'s Dep. at 69-70, 305. It is hard to believe that the Plaintiff believes her job does not require her to prioritize tasks given to her. See also Medicaid's ASA-II Job Description-Harvest Affidavit (Ex. B-1) (setting forth the numerous responsibilities and skills required to hold the position of an ASA-II) and Personnel Dept.'s ASA-II Job Description  (noting that the kind of work is "advanced and/or supervisor office support work in a variety of tasks and work methods" and "employees in this class are responsible for making decisions and solving problems using their knowledge of the activities, practices, applicable functions, rules and regulations of the organization in which employed." ASA-II Job Description-Harvest Affidavit (Ex. B-2). The Plaintiff also testified that she had experience prioritizing her work with other State Agencies she worked for. P.'s Dep. at 301.

alleged remark the Plaintiff found to be offensive, are hardly "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *White,* 126 S.Ct. 2405, 2409. These things in fact, had no significant effect on her job other than to give her an opportunity to correct weaknesses in her performance.

In addition to establishing that she suffered an adverse employment action, which she has not established, the Plaintiff must also establish proof of a causal link between her protected activity and the adverse action. *Frederick v. Sprint/United Management Co.,* 246 F.3d 1305, 1312 (11th Cir. 2001). The Plaintiff cannot prove this causal link. First, her own testimony is that she thinks something besides her complaint about Ms. Rawls resulted in the scores on her Appraisal and the inclusion of the CAP. She testified that she thinks Mr. Murphy retaliated against her when he performed the Appraisal because before she was hired, she told Deputy Commissioner, Lee Maddox, that she did not want to work for Mr. Murphy. P.'s Dep. at 279-281.

Before she was transferred to Mr. Murphy's office, Mr. Maddox called her into his office and told her that Cathy Hall, Deputy Commissioner for the area, and Mike Murphy "felt like they were getting a problem employee." *Id.* at 280. When the Plaintiff heard the concerns of Ms. Hall and Mr. Murphy, she did not want to work for them. *Id.* This, admittedly, is unrelated to her complaint about Ms. Rawls.

### B.  The Plaintiff's Supervisors Had Legitimate Nondiscriminatory Reasons for the Memorandum, Appraisals and the CAP

If a plaintiff establishes a prima facie case of discrimination, the defendant must articulate a legitimate, nondiscriminatory reason for the challenged employment action. "However, the employer's burden is merely one of production; it 'need not persuade the

court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Chapman v. AI Transport,* 229 F. 3d 1012, 1024-25 (11th Cir. 2000) (*citing Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir.1997) (internal quotations omitted)). Even if the Plaintiff had established a prima facie case of race discrimination, *which she did not,* Medicaid established that it had legitimate, nondiscriminatory reasons for the Memorandum, the Appraisals and the CAP.

Placing the Memorandum, the Appraisals and the CAP in the Plaintiff's personnel file was precisely what the Supervisors were required to do. Butler Affidavit (Ex. D-5, 7). The supervisors' actions were a straightforward application of Medicaid's policies. *Id*. While it would have been appropriate for the Plaintiff's supervisors to discipline her for her documented continued problems and lack of improvement, they only counseled the Plaintiff about it and gave her an opportunity to improve by telling her how precisely she could improve. *Id*. None of the ratings she complains of disqualified her from a promotion, nor did she receive any discipline as a result of her conduct. *Id*. Medicaid's articulated reasons for the Plaintiff's Memorandum, Appraisals and CAP are those reflected in the documents themselves, such as her failure to do the work assigned to her, her attitude problems, her late arrival for work, her failure to follow instructions and the errors in her work. *See* Finch and Lackey Memorandum and Appraisal and Murphy Appraisal and CAP-Harvest Affidavit (Ex. B-4(b-d)). The Plaintiff has offered no evidence to the contrary.

## C.  The Lack of a Transfer to Another
## ASA-II Position Was Not an Adverse Employment Action

Although it is not specifically articulated in her Complaint, the Plaintiff claims that Medicaid not transferring her to another ASA-II position upon her request was discriminatory. She wanted to transfer to another location as an ASA-II so that she would not have to work near Robin Rawls. P.'s Dep. at 290-291. The Plaintiff discussed her wishes with Mr. Maddox, who told her he did not have anywhere else to put her as an ASA-II and he that he could not arbitrarily transfer her to another area, especially in light of the reorganization that was taking place at the time. *Id*. at 293-294; Butler Affidavit (Ex. D-5).

Like her other claims of disparate treatment, to establish that Medicaid not granting her request for a transfer is disparate treatment, the Plaintiff must show that she was subject to an adverse employment action and that her employer treated similarly-situated employees who were not members of her class more favorably. *Gillis,* 400 F.3d 883, 887. The Plaintiff cannot do that here. In fact, she does not present a single similarly situated employee who requested a transfer and was given one under remotely similar circumstances.

The Plaintiff admits she wanted the same position she held at the time-that of an ASA-II, which would not have resulted in an increase in her pay or other benefits. P.'s Dep. at 290-291; See *McCann v. Mobile County Personnel Board***,** 2006 WL 1867486 *17 (S.D. Ala. 2006) (internal citations omitted). (recognizing that  "A transfer can be an adverse employment action if the new position carries lesser pay, prestige or responsibility, and '[t]he flip side of this coin would appear to be that a failure to transfer may constitute an adverse employment action if [the new position] entails an increase in

46

pay, prestige or responsibility.'"). The Plaintiff cannot show that Medicaid refusing to transfer her, outside of the normal procedure for transfers, was an adverse employment action. *See also, Gonzalez v. Florida Dept. of Highway Safety and Motor Vehicles Div*., 237 F.Supp.2d 1338, 1348 (S.D. Fla. 2002) (court recognized that an employer's failure to transfer plaintiff to another shift did not constitute an adverse employment action where plaintiff did not allege that the transfer would result in an increase in pay, prestige, or responsibility).

The Plaintiff also cannot show that similarly situated employees were treated more favorably. The Plaintiff claims that "white employees have resigned because they did not like the department, only to be rehired and placed where they desired." P.'s Dep. at 289. The Plaintiff identifies Paige Clark, a white nurse, as such a person. *Id*. at 287-288. She claims that Ms. Clark did not like the area she was being sent to as part of the Agency move, so Ms. Clark quit her job. *Id*. The Plaintiff *thinks* Ms. Clark was rehired the next day into a nursing position she wanted. *Id*.  A white employee named Dawn (the Plaintiff does not know Dawn's last name or position) requested during the Agency move that she be placed near a window and her request was granted. *Id*. at 289-290. While the Plaintiff admits that her request for a transfer and Dawn's request to move to a location near a window are different, the Plaintiff thinks her request should have been given more weight. *Id*. at 290.

Neither Ms. Clark nor "Dawn" held the same position the Plaintiff held and the Plaintiff admits that their circumstances do not involve a request to be transferred in the same position. The Plaintiff's own testimony is that these employees were not comparable. *See Lathem,* 172 F.3d 786, 793 ("If two employees are not 'similarly

situated,' the different application of workplace rules does not constitute illegal discrimination."). The Plaintiff also interviewed for another ASA-II position during this time, but was not hired for the job because the position was upgraded to another position for which she was not qualified. P.'s Dep. at 291. The Plaintiff admits that the position upgrade meant that all ASA-II's were eliminated from consideration, not just her. *Id*. at 291-292. By the Plaintiff's own admission, she was treated just like all the other people who held her same job. *Id*.

The Plaintiff believes that two other unnamed employees, both ASA's, wanted to swap positions and were allowed to do that. P.'s Dep. at 292. However, the Plaintiff did not ask for or want either of their positions. *Id*. at 292-293. Additionally, vague allegations about unnamed employees do not meet the requirements necessary to establish a similarly situated employee. *See Dent*, 129 F.Supp.2d 1311, 1314 (finding that the plaintiff failed to establish a prima facie case of disparate treatment where the plaintiff failed to identify by name an employee of another race or gender who was both treated more favorably than and "similarly situated" to him). The Plaintiff also claims Kim Black, a white employee who was an ASA-III, was treated more favorably because *after* the Plaintiff was promoted from Medicaid, Ms. Black sat at the same desk where the Plaintiff sat as an ASA-III. P.'s Dep. at 433-434. The Plaintiff heard a rumor that Ms. Black had had problems working in the Commissioner's office, but she does not know why Ms. Black was moved to the Plaintiff's old desk. *Id*. at 435. None of the alleged comparators offered by the Plaintiff satisfy the legal standard for comparators in a disparate treatment case. *See Lathem,* 172 F.3d 786, 793.

48

The Plaintiff's supervisor had good reason for not transferring her just because she asked for a transfer.[14] Butler Affidavit (Ex. D-5, 7). That reason had nothing to do with the Plaintiff's race and everything to do with following established Agency procedure. *Id.* Finally, just because the Plaintiff was not allowed to transfer just for the asking does not mean that Mr. Murphy and others at Medicaid did not take the Plaintiff's allegations about Ms. Rawls seriously. Pursuant to her Grievance, the Agency conducted a comprehensive investigation. Butler Affidavit (Ex. D-2-8). However, no one involved in the investigation concluded that there was any evidence to substantiate the Plaintiff's claims against Ms. Rawls. *Id.* After the alleged incident, Ms. Rawls in fact shared the Plaintiff's concerns about the two of them interacting and took steps to make sure she was not alone with the Plaintiff and did not assign work directly to the Plaintiff. Butler Affidavit (Ex. D-6).

### D.    Medicaid is Due Summary Judgment on Plaintiff's Additional Claims Not Included in the Complaint

In addition to the claims set forth in her Complaint, the Plaintiff alleges that she was subjected to four other adverse job actions because of her race and one other act of retaliation because of complaints she made about Ms. Rawls. P.'s Interrog. Resp. 2 (Ex. E). Should the Court consider these claims, and it is not required to, the Plaintiff bears the

---

[14] The Plaintiff attached to her Complaint a March 3, 2004 Memorandum from a supervisor, Felecia Barrow, to Mike Maddox requesting that she be allowed to acquire the Plaintiff as clerical staff in her office. P.'s Compl. That was the same time the Plaintiff was *already* being transferred pursuant to Agency reorganization. Harvest Affidavit, ¶10. As stated by Mr. Maddox in his July 28, 2004 Memorandum (Ex. D-5) he told the Plaintiff at the time that he could not transfer her into the position because of Agency reorganization and because "Dr. McIntyre did not have an authorized position where she could transfer into." Mr. Maddox explained to the Plaintiff: "unless a slot was approved beyond what was already in existence before the reorganization, I could not arbitrarily transfer her to another area." Butler Affidavit (Ex. D-5).

same burden on these claims as the claims that she was discriminated against in performance appraisals. The majority of these other claims relate to alleged incidents with Ms. Rawls. *Id*. The Plaintiff also claims as adverse actions "mental anguish from February 2003 to January 2005" and that she was "denied training." P.'s Interrog. Resp. 2.

Specifically, the Plaintiff claims that she was "assaulted twice by coworker, Robin Rawls" and "the investigation the agency conducted was very discriminatory in that it was slanted to a defensive posture allowing white co-workers who were employed by the agency to express and make request for themselves. I was never contacted or interviewed to express my concerns during the so call investigation, although I made several written requests." P.'s Interrog. Resp. 2. *S*he also claims she was "denied rights to an impartial hearing procedures as described in the Medicaid Employee Handbook." *Id*.

The Plaintiff filed, for the first time on July 20, 2004, an Employee Grievance Form alleging that Ms. Rawls had assaulted her. Butler Affidavit (Ex. D-1). Medicaid conducted an investigation related to the Grievance that began with an interview of the Plaintiff just two days after she filed the Grievance. Butler Affidavit (Ex. D- 2-8). The Plaintiff claims though that the investigation was discriminatory because it was "slanted to a defensive posture allowing white co-workers who were employed by the agency to express and make request for themselves." P.'s Interrog. Resp. 2. The Plaintiff explained in her deposition that she was referring to the same employees she claims were treated more favorably than she was: the employee who wanted to be placed near a window and the nurse who quit one day and was rehired the next day in a position she wanted. P.'s Dep. 429-430. The Plaintiff makes no claim that these same people were involved in an

agency investigation related to any sort of grievance. They are admittedly not comparable for purposes of proving that Medicaid's investigation of the Plaintiff's Grievance was "slanted to a defensive posture." The Plaintiff's own testimony establishes that these other employees' "requests" were not requests related to an ASA-II's position or to an agency investigation. *See also*, Sec. V.(C) of this Memorandum further addressing Plaintiff's claims regarding these employees.

The Plaintiff also claims the investigation was discriminatory because she was "never contacted or interviewed to express my concerns during the so call investigation, although I made several written requests." P.'s Interrog. Resp. 2; P.'s Dep. 430-431. The Plaintiff acknowledges though that she was interviewed by Mr. Maddox after she filed the Grievance. P.'s Dep. 431; *See also*, Maddox July 22, 2004 Memorandum to Coley (Ex.D-2) (bearing the Plaintiff's signature and indicating the interview took place on July 22, 2004, which was two days after the Grievance was filed). During that interview, Mr. Maddox asked the Plaintiff for all information related to her allegations against Ms. Rawls, including dates, times and witnesses. *Id*. The same day Mr. Maddox sent a Memorandum to the Plaintiff and indicated that "it is of paramount importance that I have all information in my efforts to conduct an investigation on behalf of Commissioner Carol Herrmann." *Id*. The Plaintiff admits that she did not respond to Mr. Maddox's request for information. P.'s Dep. at 360.

As part of his investigation, Mr. Maddox also interviewed Ms. Rawls on July 26, 2004. Butler Affidavit (Ex. D-3). Ms. Rawls denied the Plaintiff's allegations and she told Mr. Maddox about the written documentation she had sent to her supervisor, Mr. Murphy at the time of the incident. *Id*. Ms. Rawls also told Mr. Maddox that there were

two witnesses to the incident, who had prepared written documentation at the time of the incident. *Id*.

Mr. Maddox interviewed Tina Edwards on July 27, 2004. Maddox July 27, 2004 Memorandum to File-Butler Affidavit (Ex. D-4). Ms. Edwards recalled the incident and that she had provided written documentation to Mike Murphy at the time of the incident. *Id*. She also indicated that the Plaintiff was very upset and talking in a loud tone and that Ms. Rawls told the Plaintiff not to leave. *Id*. Ms. Edwards never saw Ms. Rawls touch the Plaintiff and never saw Ms. Rawls block the Plaintiff from leaving. *Id*. Ms. Edwards then provided to Mr. Maddox the written account she had previously provided to Mr. Murphy. *Id*.

On July 28, 2004 Mr. Maddox outlined his investigation of the Plaintiff's Grievance in a "Memorandum for the Record."  Maddox July 28, 2004 Memorandum-Butler Affidavit (Ex. D-5). Mr. Maddox indicated that the Plaintiff was asked to provide witnesses who saw the alleged incident with Ms. Rawls and the Plaintiff refused. *Id*.  On August 2, 2004 Ms. Rawls sent a Memorandum to Mr. Maddox as a follow up to their meeting on July 26. Rawls August 2, 2004 Memorandum. Butler Affidavit (Ex. D-6). Ms. Rawls denied "in the strongest terms possible that I have ever assaulted Elaine Coley on March 15, 204 or any other date. As a result of the anger and aggression displayed by Ms. Coley, I felt I was the one in danger of physical attack." *Id*. She also indicated that since the incident, she had to avoid being alone with the Plaintiff or having conversation with her. *Id*. Because of the incident, Ms. Rawls no longer directly assigned work to the Plaintiff, but made all assignments through Ms. Rawls' supervisor Mike Murphy. *Id*. As part of her Memo, Ms. Rawls also provided her own statement related to the March 15,

52

2004 incident, along with the statements of two witnesses, Ms. Edwards and Ms. Owens. *Id*.

Because the Plaintiff sent a Memorandum to Commissioner Herrmann accusing Mr. Maddox of being unprofessional in his handling of the Grievance, Medicaid's General Counsel Bill Butler reviewed the Grievance and investigation related thereto. Butler Affidavit (Ex. D-7). Mr. Butler concluded that the investigation did not show an actionable grievance and did not justify the convening of a Grievance Hearing Panel. *Id*. He specifically found that there was no evidence to support the Plaintiff's allegations of assault and that if anything, discipline could have been initiated against the Plaintiff based on her conduct and actions toward Ms. Rawls. *Id*. Mr. Butler also concluded that Mr. Maddox was correct to limit his investigation to the alleged assault since a complaint related to an annual appraisal is not a grievable issue under AIM 404. *Id*. The Procedures specifically state that they do not apply to annual employee evaluations where the overall rating is "meets standards" or above. *Id*. Since the Plaintiff had also accused Medicaid of providing her CAP and other materials to DOT, which she claims resulted in DOT not promoting her to ASA-III, Mr. Butler reviewed that issue as well. *Id*. He found no evidence that Medicaid provided any information to DOT. *Id*. He noted that the proper protocol followed by state agencies, is to obtain personnel information directly from State Personnel Department. *Id*.

On August 24, 2004 Commissioner Carol Herrmann wrote to the Plaintiff to advise that the investigation of the Plaintiff's Grievance did not warrant the convening of a grievance panel or other action by Medicaid. Butler Affidavit (Ex. D-8). Commissioner Herrmann further advised the Plaintiff that if she believed she had been treated unfairly

or abusively, she could appeal under the merit system to the State Personnel Board or file a complaint with the EEOC. *Id.* The Plaintiff chose to file a complaint with the EEOC. P.'s Dep. at 365, 367.

The Agency's investigation of the Plaintiff's Grievance was done according to Agency procedure, which involved interviewing the relevant parties. When the Plaintiff accused Mr. Maddox, who was conducting the investigation of doing so improperly, Medicaid's General Counsel reviewed the investigation and made recommendations to Commissioner Herrmann. Butler Affidavit (Ex. D-7). Medicaid did exactly what it was supposed to in investigating the Plaintiff's Grievance. *Id.* Nothing about the Agency's investigation of the Grievance constitutes an adverse employment action under Title VII. Further, the Plaintiff does not identify a single employee that is similarly situated but was treated more favorably.

Finally, the Plaintiff claims she was "denied rights to an impartial hearing procedures as described in the Medicaid Employee Handbook." P.'s Interrog. Resp. 2. The Plaintiff explained in her deposition that she did not know what rule dictated that she automatically be given a hearing on her Grievance, but she thought she was entitled to a hearing. P.'s Dep. at 373-374. As set forth in the Report, the Grievance Procedures in AIM 404 provide in part:

> If the grievance is not resolved at the above level, it will be the responsibility of the Human Resources Officer or designee to present a report to the Commissioner on the grievance and the recommended action to resolve grievances. The Commissioner will review the facts to determine if the grievance can be resolved based on the recommended action or whether a Grievance Hearing Panel is warranted and will be commissioned or whether to advise the employee to seek redress with an outside sate or federal agency. . . Butler Affidavit (Ex. D-7).

The record is clear that the Agency followed the guidelines set forth in the Grievance Procedures and that the Plaintiff was not automatically entitled to a hearing just because she wanted one. *Id*.

In addition to her claims related to Ms. Rawls, the Plaintiff also alleges as adverse employment actions, "mental anguish from February 2003 to January 2005" and that she was "denied training." P.'s Interrog. Resp. 2. Mental anguish is not a cause of action but goes to the measure of damages under Title VII. *See* 42 U.S.C.A. §1981 a(b)(3). Additionally, the Plaintiff testified that she enjoys good mental and physical health. P.'s Dep. at 427.

Regarding training, the Plaintiff claims that after she was given the Memorandum by Ms. Finch and Ms. Lackey, she was scheduled for a training and it had to be cancelled because the Plaintiff had not completed work that had been assigned to her. P.'s Dep. at 301-302. She does not allege that any other employee who had failed to do her work was still allowed to attend the training. In fact, she does even not recall what the training was for. *Id*. The Plaintiff attempts though to compare her single cancelled training to the assistance she says Christa Sanders, a white nurse, received after Ms. Sanders "had some problems with some time or something that they were having done in that section, about the time." *Id*. at 439-442. The Plaintiff did not seek this same sort of assistance but thought since she was having problems with her job performance, "they should have allowed me to get the training that was offered." *Id*. at 443. The Plaintiff does not allege, much less prove, that a similarly situated employee was treated more favorably.

The Plaintiff also alleges that the positions that were upgraded from ASA-II positions after she applied for them were upgraded in retaliation for her complaints about Ms. Rawls. P.'s Interrog. Resp. 8. The Plaintiff admits that the position upgrades meant that all ASA-II's were eliminated from consideration, not just her. P.'s Dep. at 291-292. By the Plaintiff's own admission, she was treated just like all the other people who held her same job. *Id.* An action that admittedly affected all ASA-II's, both white and African American, the same way can hardly be considered "an action by an employer that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *White,* 126 S.Ct. 2405, 2409. As set forth above, Medicaid is entitled to summary judgment on all of these additional claims.

## VI. CONCLUSION

While the Plaintiff may think she was treated unfairly, she has no evidence to support her claim that her treatment was related to her race or any protected activity. The Plaintiff complains about actions that did not rise to the level of adverse employment actions for purposes of disparate treatment or retaliation, where no white employee was treated any differently and where Medicaid had legitimate reasons for all of its actions. The Plaintiff has not produced any evidence that Medicaid violated any law. In fact, Medicaid's evidence and the Plaintiff's own evidence establish that the Plaintiff has been treated properly under the law.

Dated: March 22, 2007.

**s/Amanda C. Carter**
MARK D. WILKERSON (WIL072)
AMANDA C. CARTER (CAR116)
Attorneys for Defendant
Alabama Medicaid Agency
WILKERSON & BRYAN, P.C.
405 South Hull Street
Montgomery, AL 36104
Telephone:  (334) 265-1500
Facsimile:  (334) 265-0319
mark@wilkersonbryan.com
amanda@wilkersonbryan.com

**OF COUNSEL:**

WILKERSON & BRYAN, P.C.
405 South Hull Street
Montgomery, AL 36104
Telephone:  (334) 265-1500
Facsimile:  (334) 265-0319
mark@wilkersonbryan.com
amanda@wilkersonbryan.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this the 22nd day of March 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and that I mailed a copy of the foregoing to the Plaintiff, properly addressed and first class postage prepaid.

Elaine M. Coley, Pro Se
6321 Sandy Ridge Curve
Montgomery, AL 36117
(334) 207-3606

<u>s/Amanda C. Carter</u>
MARK D. WILKERSON (WIL072)
AMANDA C. CARTER (CAR116)
Attorneys for Defendant
Alabama Medicaid Agency
WILKERSON & BRYAN, P.C.
405 South Hull Street
Montgomery, AL 36104
Telephone:  (334) 265-1500
Facsimile:   (334) 265-0319
mark@wilkersonbryan.com
amanda@wilkersonbryan.com