# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:06CV378-WKW

ELAINE M. COLEY,

Plaintiff,

ORIGINAL

vs.

ALABAMA MEDICAID AGENCY,

Defendant.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of Elaine M. Coley may be taken before Angela Smith, RPR, CRR, at the offices of Wilkerson & Bryan, at 405 South Hull Street, Montgomery, Alabama 36104, on the 12th day of January, 2007.

DEPOSITION OF ELAINE M. COLEY

any other departments besides DOT and Medicaid?

A. I believe I worked just a short time for Mental Health.

Q. You believe you did, or you know you did?

A. I know I did.

Q. Okay. Approximate time periods, Ms. Coley?

A. I could find out. I just don't remember right now. And I'm sorry.

Q. Is it before you went to DOT?

A. You know, I think it was in between some assignments that I had at DOT.

Q. Let's start with DOT. Aside from the ones you've already told me about, tell me about what you remember next, as far as working for DOT.

A. I know I went back to DOT in 1999 on a permanent position.

Q. Well, let's start there, since you seem to have a recollection of that one. Okay?

A. Uh-huh.
Q. Did you apply for a position in 1999, or were you transferring from a temporary position?
A. No. I transferred from a permanent position from the Department of -- Okay. Here we go. From the Department of Corrections.
Q. So, you also worked at the Department of Corrections?
A. Yes, ma'am, I did.
Q. Okay. What was your position at the Department of Corrections?
A. I was an ASA I.
Q. Okay. Tell me what an ASA is.
A. ASA I is an administrative assistant.
Q. Okay. Is that secretarial work?
A. It is secretarial work.
Q. Okay. How long were you in that job?
A. I believe I went there in '94.

'94.

Q. Okay.

A. Wait. No, no, no, no. I went there in -- I'm getting these dates mixed up. I went there in -- Okay. In '98 I to work at Corrections.

Q. Okay.

A. In '98, I worked for Corrections. And then I left Corrections and went to Transportation.

Q. Okay. In '98, you worked for corrections as an ASA 1?

A. Yes.

Q. Who was your supervisor?

A. Gussie Jackson.

Q. Male or female?

A. Female.

Q. Okay. Did you have any other supervisors while you worked at DOC?

A. No.

Q. Okay.

A. I'm sorry, DOC?

Q. Department of Corrections.

A. Department of Corrections, no.

Q. Okay. So, Ms. Gussie Jackson was your supervisor?

A. Uh-huh.

Q. Were you ever disciplined or reprimanded or called in to anybody's office?

A. At DOT -- At DOC, I think I stayed there a year and a half, if I'm not mistaken, a year and a half, approximately.

Q. Okay. Back to the question of was there ever any disciplinary action, reprimands?

A. No.

Q. Were you evaluated on your performance?

A. I was.

Q. And do you recall what those evaluations showed?

A. Exceeds standards.

Q. Exceeds standards. Okay.

A. Exceeds standards.

Q. Did you ever have any problems

with coworkers, personality conflicts, anything like that?

A. No.

Q. Anybody else there?

A. No.

Q. Okay. And why did you leave your position as an ASA I with DOC?

A. I transferred out. It was a lateral transfer.

Q. To DOT?

A. Uh-huh. Yes.

Q. And you think that was probably in the year 2000?

A. No. The transfer was to DOT, Department of Transportation, the first -- I believe it might have been the first part of 1999.

Q. Okay. And who was your supervisor there?

A. Benita Crosskno, C-R-O-S-S-K-N-O.

Q. And what was your job title there?

A. ASA I.

Q. While you were an ASA I, while Ms. Benita Crosskno was your supervisor, did you have any sort of reprimands, disciplinary action, any kind of critique of your work?

A. I did.

Q. Okay. Tell me about that.

A. Ms. Crosskno accused me of not calling in to work one day, saying that I had not called in. But I did call in. I just couldn't get in on the lines, because the lines was -- sometimes you couldn't get through because our lines would be messed up.

And she reprimanded me because I had spoken with another employee on one occasion. The employee was upset and came to me upset. And I tried to console the person. And she told me that -- Well, she had evidently -- Benita said she had witnessed an incident. She said she did not witness the incident, and said she didn't --

Q. Okay. Tell me why you thought it was your race and your gender and your age that she said these things that you testified about.

A. Well, I think it was my race, because she always had something to say about the Consent Decree. She would always say: Well, these black people come in and they think that they can get away with the Consent Decree, or this or that. She said they think that because the Consent Decree will save everything for them, or get them by with everything. And then she called me old Bimbo.

Q. How old was she, do you remember?

A. I don't know how old she was.

Q. Okay. After you worked for Ms. Benita Crosskno, where did you go next? You mentioned that you transferred out. Where did you transfer to?

A. I went to Medicaid.

Q. Okay. And what year was that?

A. 1999.

Q. Okay.

A. I'm sorry. It was 2000, the year 2000.

Q. And what job title did you have?

A. I was still an ASA I.

Q. Okay. Who was your supervisor?

A. Faye Smith.

Q. And how long was Faye Smith your supervisor?

A. Approximately a year and a half.

Q. Okay. While Faye Smith was your supervisor, did you run into any problems -- Let me strike that.

While Faye Smith was your supervisor, were you ever disciplined or called into her office or counseled about your work habits?

A. No. The only problem I could see that I had with her was, I'm one of

Q. And that was your personal picture that you brought from home?

A. No. Well, I bought it. I didn't bring it from home. It was a picture --

Q. But it wasn't Medicaid's property, it was your own personal property?

A. It was.

Q. Okay. Did you have a problem with him asking you to remove it?

A. Well, I kind of did, but it wasn't no big deal. I moved -- I removed it.

Q. Okay. Anything else?

A. No.

Q. No other discipline?

A. No disciplines.

Q. What was your rating on your evaluation?

A. Meets standards.

Q. Do you recall why it was not exceeds standards?

A. Well, I did discuss it with

him, and he told me that he thought that -- He said he thought that -- What was it he told me? Anyway, it was a misunderstanding, because when I got to that area, there was a workload that there was a huge workload. He thought they'd been trained. Well, after Ms. -- After Audrey left, there was nobody to train me. So I had to learn the job as well as work with an extra load of influxing work that came in.

So he said that's why he graded me meets standards because he thought that I was kind of slow because I wasn't keeping up with the girl that was already there. But that was after the fact, because once I explained it to him after we had it, and he told me, he said: Well, I did not know. You know, he said: I thought you had been trained.

Q. So, were you satisfied, then, after your discussion?

A. Well, I mean, after we talked, I knew why he had graded me the way he did,

Q. I'm sorry, you can just read it silently. You don't have to read it out loud.

A. Okay.

Q. Okay. Are you finished?

A. Uh-huh.

Q. Okay. You say now that you are complaining that: Medicaid engaged in discrimination in performance appraisals, costing Plaintiff promotional and advancement opportunities. Defendant placed negative information in my personnel file as well; is that right?

A. That's correct.

Q. Okay. Let's first talk about the discrimination in the performance appraisals you refer to in that paragraph. Tell me what the first performance appraisal is that you're talking about.

A. The first performance appraisal is the one with Linda Lackey and Mary Finch.

Q. Okay. And did you produce

particular method because she had some personal issues against me or whatever. Now, what, I don't know. Because she came to me one day when I was sitting at my desk and said she noticed that I had had some problems. And that was a total shock to me because she said she thought I was upset with her or with somebody. And I told her, I said: I'm really not upset with anybody.

But after -- Shortly after that, she proceeded to do my evaluation, and accused me of not doing the evaluation -- not doing the work that I had been assigned. And she said that I had had -- I raised my voice at her, if I'm remembering correctly from some stuff I read from the evaluation that I had.

She said that I had raised my voice at her in a demeanor. And that since she'd talked with me earlier, she had seen some improvement in my work.

And the discrimination part was, I think that basically she did it

because -- Well, my thing is that she has not -- she didn't do anybody else like that. She never called anybody else in and accused them of not doing their work.

Q. Well, could that --

A. When I know that there were other employees who were missing project deadlines and not meeting deadlines.

Q. And how do you know what other employees were doing?

A. I was working with them.

Q. Was it the same deadline that you were to meet?

A. Yes. It was entailed in the same deadline.

Q. So, is your claim, then, that you were talked to about not meeting a deadline, and other people had the same deadline, but they weren't talked to about it?

A. Well, my claim is --

Q. Yes or no.

A. Yes.

Q. Okay. So, you said that she came to you before the performance appraisal. How many days before?

A. I don't remember.

Q. More than a week?

A. I don't remember.

Q. More than two weeks?

A. I don't remember.

Q. The day before?

A. I don't remember.

Q. So, you have no idea what period of time?

A. I don't know whether it was the day before, two weeks before. I don't remember. I don't remember.

Q. Okay. But in any event, she counseled you, then, about what she considered to be work-performance issues; is that correct?

A. Well --

Q. Yes or no?

A. Not work-performance issues.

Q. Okay. Then what was it?

A. My attitude.

Q. Your attitude?

A. Yes.

Q. Okay.

A. At that particular time. She seemed to have thought that I was angry about something.

Q. Were you?

A. No, I wasn't.

Q. Everything was great up until she came to you and asked you that; is that right?

A. Well, it wasn't necessarily great, but I wasn't angry at anybody.

Q. Were you ticked off at anybody?

A. No.

Q. Were you unhappy with anything?

A. No. Not particularly, at that time.

Q. Were you a little bit?

A. No.

Q. Okay. So, then, she tried to talk to you and you told her there was nothing wrong. And she said: I want you to know if you have any problems, you can come to me?

A. Uh-huh.

Q. Okay. So, what does that have to do with the discrimination on a performance appraisal that we were talking about?

A. Well, I think that later on it escalated to the point as to where she decided that she was just going to break me down on my evaluation.

Q. She just decided out of thin air that she was going to give you a bad grade?

A. As far as I could tell, she did.

Q. Okay. So, were there any incidents between the time that she talked to you and the time you had your evaluation where she counseled you anymore or talked to

you about your attitude?

A. Not that I know of.

Q. Did you go to her with any problems?

A. No, I didn't.

Q. And have you had any problems?

A. Not that I know of.

Q. Okay. You were getting along well with her and with everybody else?

A. Well, I thought I was.

Q. Okay. Well, you just said that things escalated by the time of your evaluation from what?

A. I mean, with her. I mean, with her. And as far as she was -- the things she was doing. Just like when she came to me and asked me was something wrong with me. I didn't think anything was wrong with me. I wasn't mad at anybody. I wasn't angry at anybody. I felt like she probably just went on with whatever she had in her mind.

Q. Well, let me ask you this. Is

there anything wrong with a concerned supervisor going to an employee and saying: You know what, I think there may be problems, I just want to --

A. No, there's nothing wrong with that.

Q. Okay. Did you have a problem with it in this instance?

A. No, I didn't.

Q. Okay. I guess I'm trying to figure out still how something escalated between that time and the evaluation. Nothing else happened? You didn't have any conversation with her that raised a red flag or made you uncomfortable?

A. No.

Q. Okay. So take me to the day of the evaluation.

A. Well, the day of the evaluation we sit down and we talked, and I told her, I said: Linda, I see that you've given me this score. I said: Isn't there another score that I'm supposed to have?

Because I was thinking that she was going to do part of it, and then Charles Shelnut should have had some input in it.

She said: No, Elaine. She says: I don't think that -- She said: You've been up here X amount of months. I don't remember what she told me. She said: But -- the amount of months. She said: And I'm doing your evaluation. I told her: I don't think that that's following procedure. I said: The procedure is that you should have gotten some input from Charles Shelnut. She told me, she said: Well, okay. So she said: Well, just hold on a minute.

She got on the phone and she called Mary Finch. So Mary Finch came up and sat down and talked to me and explained to me. She said: Well, I think -- And I told her, I said: Well, the score that you have here, I said: I'm supposed to have another score because I haven't been here a whole evaluation period.

Q. And what was an evaluation

right now. I can get back with you with that information.

Q. Okay.

A. I had -- At the time I had looked it up, and I saw where they needed -- Because I knew I had not been there a whole evaluation period. See, I came to that office in February of '03, and that was, like, in June of '03.

Q. Okay.

A. So the majority of that evaluation period was done in the Elderly and Disabled Section. Mr. Shelnut was called, however.

Q. Okay. And so, did he give input into your evaluation?

A. He did.

Q. Okay. Did that satisfy you?

A. Well, I ended up with a meets standard score.

Q. Were you satisfied with that score?

A. I was not satisfied with it,

but I did not rebuttal it, because it was a meets standard category.

Q. Okay. Tell me what about it you were not happy with.

A. Well, first of all, I was not happy with it because she had not looked up and did not know the procedure. And it seems as to me if I had not known -- She was my supervisor. If I had not known this procedure, she would have given me a lower score.

Q. But you told her, though, and she did what she was supposed to do?

A. Well, she was supposed to have known, Ms. Carter. She was supposed to have known.

Q. I understand that that's your opinion.

A. She was my supervisor. She was grading me on different things. So I was wondering -- It gave me to wonder -- It made me wonder why she would want to grade me low if she did not know the procedure.

Q. Well, whether or not she knew the procedure, you told her what you thought the procedure was. She obviously contacted Mr. Shelnut. He gave his input. And you got a meets standard. And you, in fact, got a raise, didn't you?

A. No, I didn't.

Q. You didn't get a raise at that time?

A. I did not.

Q. Okay.

A. Because they were frozen. Nobody at the agency was getting a raise.

Q. Was it recommended, though, that you get a raise?

A. Well, with a meets-standard score, you usually do get a one-step raise.

Q. Okay. But the fact that you didn't get a one-step raise had nothing to do with you individually; is that right?

A. No, it didn't.

Q. Okay. And you're not --

A. Or them, because the agency

was freezing all --

Q. All raises?

A. Uh-huh.

Q. Okay. Do you recall that seven of the nine ratings on your evaluation were meets standards?

A. Not right offhand.

Q. Do you recall which ones -- Were you dissatisfied with any of the individual ratings?

A. I believe it was one in particular that I wasn't satisfied with.

Q. And what was that one?

A. It was the one where it says that I had transcribed, and something else with it. I was not satisfied with that particular one, I believe. I don't remember.

Q. You don't remember why you weren't happy about it?

A. I do remember why I was unhappy about it. I was just saying I don't remember any other ones.

Q. Okay. Well, why were you unhappy about that one?

A. Well, because when I was interviewed for the job I explained to Ms. Finch, Ms. Finch interviewed me, not Ms. Lackey, Ms. Finch interviewed me, and Dr. Searcy, and I especially told them that I could not transcribe. I had not done any transcribing, or had I done any work on that line.

Q. But did you understand it was part of your job responsibilities?

A. She told me that it would not be.

Q. Oh, she specifically told you --

A. She specifically told me that I would not have to transcribe.

Q. Okay. So, then you were dissatisfied when you were evaluated on that skill?

A. Yeah. Because when I sit down to talk with them about it, that was one of

the first things that I had noticed that they had listed on there. When I had told her -- I had, in fact, told her that I could -- that I had not done any. I did tell her that I was willing to learn to do it. Since I could type, I did tell her that I was willing to learn to transcribe.

Q. Okay. Well --

A. But I had not done it.

Q. Okay. Getting back on track, you're telling me what the discrimination in your performance appraisals were with Ms. Linda Lackey and Ms. Mary Finch, although you can't remember the date, is that right, about evaluation, or that appraisal?

A. I don't remember the date of the evaluation.

Q. Do you?

A. Well, that particular date, I believe it was dated June 30th, if I'm not mistaken.

Q. Of what year?

A. '03.

Q. Okay. So, we're talking about the June evaluation, with Ms. Linda Lackey and Ms. Mary Finch. And you told me that you recalled there was one thing on the evaluation that you were unhappy with, and that involved transcribing?

A. Uh-huh.

Q. And that you were also unhappy with -- I can't remember now if it was Ms. Finch or Ms. Lackey, not knowing the rule that she should have --

A. Ms. Lackey.

Q. Ms. Lackey not knowing the rule that she should have consulted with your other supervisor, your previous supervisor, Mr. Shelnut. But then you went on to testify that she did consult with him after you called it to her attention and he participated in the evaluation.

A. Yes.

Q. Is there anything else that constituted discrimination in that

performance appraisal?

A. Well, the discrimination came in that I don't think any other employee had to go through that. There were other employees who were there besides myself, white employees, who did not have to go through that.

Q. Go through what?

A. Go through the procedure that I had to go through with her to explain to her about my evaluation.

Q. So, you have a problem --

A. They did not grade -- They did not grade white employees on the same terms that they graded me on.

Q. Well, how did they grade white employees?

A. Well, to my knowledge, nobody was given any -- nobody was given any -- nobody was given any -- any reason to be upset by -- about the evaluations.

Q. Did you see their evaluations, Ms. Coley?

A. Of course not.

Q. So, how do you know what was in them?

A. I don't know what was in them.

Q. Did you participate in those meetings with those employees and their supervisors?

A. I wouldn't have any reason to.

Q. Well, then, how do you know what happened?

A. Well, because nobody else complained. I was -- Nobody else said anything about their evaluation.

Q. You mean nobody else said anything to you?

A. To me, that's right.

Q. Does that mean nobody else was dissatisfied?

A. I don't know.

Q. It just means you don't know; is that right?

A. That's right.

Q. Okay.

A. But I don't think that they were graded in the same manner that I was.

Q. Well, why don't you tell -- But you don't know that. You just said you didn't see their performance appraisals, isn't that right?

A. No -- Yeah. That's right. I didn't see their performance appraisals.

Q. So, then, you don't know what they said?

A. No, I don't.

Q. Okay. Well, what employees are we talking about that you think were graded more fairly than you were?

A. There were white employees in the same section that were graded -- I'm sure they were graded. And if you check the records, I'm sure you could find out.

Q. Well, tell me their names, Ms. Coley.

A. Robin Rawls.

Q. Ms. Rawls was not a ASA -- Were you an ASA II or III at this time?

A. It doesn't matter about position they was. It just matters as to whether they were graded differently from me. I'm not talking about what positions, or what position they held.

Q. We're talking about what I say we're talking about today, because I'm the one deposing you. And if you want to depose somebody at Medicaid and ask questions and decide what's going to be asked, you certainly have the right to do that, and we expect you to do that. But I get to ask you about their names and their job titles and all that. I'm not trying to be argumentative.

A. Okay. Another name is Pam Owens.

Q. Okay. Back to Ms. Rawls for a minute.

A. Uh-huh.

Q. Back to this time period for a minute, when you got this performance appraisal from Lackey and Finch, were you an

ASA III at the time?

A. No, I was not.

Q. You were an ASA II?

A. Yes.

Q. Okay. What position did Ms. Rawls hold at the time?

A. She was a supervisor. I'm not sure what her --

Q. But she was not an ASA II or III, or anything else?

A. No.

Q. What about Pam Owens?

A. Pam Owens was, I believe, working in the capacity of a nurse.

Q. Okay. So, she was not an ASA II either?

A. No.

Q. And she wasn't even evaluated on the same characteristics as you were, or shouldn't have been, should she?

A. No, she wasn't.

Q. What about Ms. Rawls?

A. No. The job duties were

different.

Q. Okay. Who else? Do you remember anybody else?

A. Oh, I'm sorry. Jean Stone.

Q. Female?

A. Female.

Q. Okay. And what was Ms. Stone's position?

A. She was a nurse.

Q. Okay. So, she also was not an ASA?

A. No.

Q. And would not have been graded on the same things that you were graded?

A. No. Not the same duties.

Q. Okay. Anybody else?

A. There were no other ASAs. I was the only one.

Q. Okay. But is there anybody else that you're talking about here that you're trying to compare yourself to?

A. Myron Uptain.

Q. What was Myron Uptain's

position?

A. I'm not sure.

Q. Do you know if Myron Uptain was an ASA II?

A. He was not.

Q. Okay. So, then, is it safe to assume that he would not have been graded on the same things that you were graded on as an ASA II?

A. He wouldn't have been graded.

Q. Okay. Anybody else besides those four people?

A. There is another lady's name, but I don't remember what her name is.

Q. Do you remember what her title was?

A. I don't.

Q. Do you remember if she was an ASA?

A. I don't think she was. She worked with Myron Uptain.

Q. Okay. So, then, she also would not have been graded on the same

things you would have been graded on?

A. No.

Q. Okay. So, is that everything that constitutes discrimination in performance appraisals with Linda Lackey and Mary Finch?

A. I may have some more that I can add later. I don't remember right now.

Q. Well, now is the time. That's why we're here, Ms. Coley, so that you can tell me the basis of your lawsuit. So if you need a moment to think about it, you're free to take it.

A. Okay.

Q. So, is your answer no, right now, that you don't know of any other discrimination in performance appraisals?

A. No. Right now -- No, for right now.

Q. Next you say that: Discrimination in performance appraisals cost you promotional and advancement opportunities. Just talking about the Linda

Lackey and Mary Finch performance appraisal, tell me which promotional and advancement opportunities you were denied as a result of their appraisal.

A. Well, it was the attachment that they attached to my appraisal.

Q. Okay.

A. That was in my file. When I -- I did take the exam and got on the register for the ASA III position. Although, in my opinion, the attachment they attached to my evaluation was mostly instructional, it gave the appearance of my being a problem employee.

Q. Were you?

A. Well, I don't think I was.

Q. Do you know if other people thought you were?

A. I don't know what -- I can't speak for other people. Nobody told me that they thought I was.

Q. Okay. So, you said that it was the attachment to the appraisal that

cost you promotional and advancement opportunities. What promotional and advancement opportunities are we talking about?

A. Ms. Carter, I was passed over thirty-two times as a result of the attachment attached to my file in personnel. Prior to that, I was able to be promoted and move around or seek another job, as other employees are able to do if they so desire.

Q. Okay.

A. Once that attachment was placed in my file, it stopped.

Q. Okay. Thirty-two times?

A. Thirty-two times.

Q. Were you qualified for the positions that you applied for?

A. Well, the exam said I was.

Q. Okay. Let's start at the beginning. What was the first one in this line of thirty-two times you applied for things?

A. They were different State

departments. I would have to go back and try to gather them up for you. I don't have those.

Q. Well, you know, you filed a lawsuit against Medicaid. And you said in the very first page of your complaint that you're complaining about being denied promotional and advancement opportunities. And what you're telling me right now is that you're not prepared to talk about that at your deposition; is that right?

A. I can talk about it. I can talk about it.

Q. You just said you don't have the dates, you don't know what the thirty-two things were.

A. I don't have the dates. I can give you some of the agencies' names that I was passed over.

Q. Well, why don't you give me what you know.

A. Okay. I was passed over by Mental Health, Transportation, the

Department of ADECA, Insurance Board. And a couple of those agencies I was passed over a couple of times, more than one time, because I came up on the register, my name came up on the register and I was interviewed for.

Q. Okay. Let's talk about the ones that you remember. That's one, two, three, four that could have been multiple times you said. Let's talk about Mental Health. Do you know when you put your name on the register for Mental Health?

A. I think my name got on the register approximately around September 2003.

Q. Okay. And let me just get this straight so I understand that and so the Record is clear. You put your name on the register for an ASA III position?

A. Well, I didn't put it on there. My name got on there. I took the exam.

Q. But the purpose of taking the exam was to get on the register?

A. Was to get on the register, yes.

Q. Okay. So, you took the exam for ASA III? What do you need?

A. I left my water in the car.

Q. We'll get you some water. You put your name on the register?

A. Yeah. I took the exam and my name came up on the register.

Q. Okay. And so it wasn't a matter of applying for a specific job at Mental Health, your name went on the register, and Mental Health just happened to be the next one with an ASA-III opening, is that how it works?

A. Right. That's how it works.

Q. Okay. So, Mental Health, then. Do you recall the timing of being contacted about your name being on the register for Mental Health?

A. No, ma'am.

Q. Okay. But you were not hired --

A. It was not after September 2003. It was after I got on the register, yeah.

Q. How did you learn you were not hired?

A. Sometimes they would send you a letter to let you know, and others would call to let you know that you weren't hired.

Q. Okay. Do you recall if it was a letter or if you were called?

A. No.

Q. Do you have a file or anything with these documents in it?

A. No, ma'am, I don't.

Q. Okay. And you don't have any, obviously?

A. Some of the documents that I had, like I told you, were destroyed. So I had some of them, but I don't now.

Q. Okay. But you no longer have these?

A. I may have one or two.

Q. But you haven't produced them;

I don't have a problem with you asking the Judge to depose me again, I'm just explaining to you why I didn't.

Q. That's fine, Ms. Coley. I don't need your explanation. We're going to talk about your production request in a few minutes. I'm going to ask you about your efforts to find the documents that I asked for.

And going back to Mental Health, do you recall how you learned that you were not hired as an ASA III with Mental Health?

A. I don't remember if they called or sent me a letter.

Q. But in any event, you were not hired as an ASA III?

A. I was not.

Q. Do you know who was hired?

A. I don't.

Q. So, you don't know if that person was white or black or more qualified?

A. No, I don't.

contact them about why you weren't hired?

A. Huh-uh.

Q. Do you know for a fact the reason that you were not hired by Mental Health?

A. I believe that if I --

Q. Not what you believe, but what you know.

A. Either it was a letter or phone call that I received. It was because of the information that was found in my file.

Q. So, you actually received either a letter from Mental Health or somebody called you from Mental Health and said: We didn't hire you because of what's in your personnel file?

A. That's correct.

Q. Did you take any action after that?

A. I did not.

Q. Why not?

A. Towards Mental Health?

Q. Towards anybody.

A. No.

Q. Okay. But you said you did with regard to DOT; is that right?

A. I did. Because I think -- I did talk -- I did reply to DOT because that's where it was initiated, the letter for the passovers.

Q. Could you tell me that again. I'm not sure I understand you.

A. Well, the person that -- The first -- When I first learned that I had been -- I had been passed over before I found out about it sometimes -- a couple of times, I found out later on.

But, Mr. Brown, Jeffrey Brown, is the person who initiated the letter for the passover that I received from personnel through Transportation.

Q. Do you have that letter?

A. No. I believe it was destroyed. I can try to get a copy.

Q. And do you recall what

Mr. Brown's letter said?

A. Well, actually, it was asking personnel to pass over me because of when we discussed with Ms. Crosskno, it was involving the incident with her.

Q. Oh, so, it's way back to DOT?

A. Yeah. It goes back to that.

Q. Well, let me ask you what that has to do with Medicaid?

A. Well, the incident -- The information was -- Mr. Brown saw my information in my folder that Medicaid had put in there.

Q. Okay. But --

A. And what he did was he got that information and the information from Transportation, and that's what he used to ask for the passover.

Q. And did he say that, that he made his decision based on the information from Medicaid and based on the information from DOT?

A. Yes.

Q. He did?

A. Yes.

Q. Okay. Did he specify that it was the attachment to the performance appraisal or your meets-standards grade? Or did he specify what it was about your performance appraisal or what was in Medicaid's file that caused him to make his decision?

A. Well, if I'm remembering correctly, he said that he thought that I would not be able to perform the duties of the job.

Q. Based on your personnel file?

A. Based on the information he found in my personnel file.

Q. Okay. So, how do you know, then, that it was the attachment?

A. Because, see, he said that. He said that based on the information he found in my personnel file.

Q. But couldn't it be other information?

A. Well, there was nothing else too much derogatory, besides the information that he found for -- that Ms. Crosskno filed in my personnel file. That would have been the only thing -- That was the only thing that I was told that he had access to.

Q. Speaking of what he has access to, when you take an exam to get put on the register, do you know what the procedure is for obtaining your personnel file?

A. The procedure for me obtaining my personnel file?

Q. No. Not for you. But the person that you want to go to work for. For example, in the instance of Mental Health, you've taken the test, you've been put on the register, they need an ASA III, so you're already a State employee and have a personnel file. Do you believe they're entitled to see that file?

A. Yes, they're entitled to it, I've been told.

Q. Okay. Do you have a problem

with that?

A. No. But there are procedures you have to go through.

Q. And you want them to follow those procedures, I'm sure?

A. Uh-huh.

Q. But do you know what they are?

A. Yes, I do.

Q. Okay. What are they?

A. Well, they can go and view my -- but they should have a formal request from one department to the other, to view your files, to review a person's records.

Q. So, you think that they have a right to get the files from one department to another?

A. Well, I think that they probably should have gone to personnel and got permission from personnel.

Q. Okay. Do you have any reason to believe that procedure wasn't followed?

A. Yes, I do.

Q. And what is that?

A. Well, because he -- See, certain -- There are certain records that go in your State personnel records, and there are certain records that go in -- like if you have an office. Like, Transportation has their own personnel department.

If you give me instructions, I don't think that those instructions should be placed in my personnel file. I think that it's a matter of my performance and my grade.

Q. Let me ask you this, Ms. Coley.

A. You don't need instructions in my personnel file.

Q. But that's your opinion; right?

A. But it should not be. They don't do that. The agencies don't do that. That's not part of the procedures.

Q. How do you know that?

A. I read it in the handbook.

Q. Okay. So, that came from the

handbook, too?

A. Yeah.

Q. The handbook that you haven't provided?

A. That I don't have.

Q. Okay. But you're claiming that the handbook says that you can't put extra stuff in the personnel file?

A. There are State personnel rules and laws --

Q. Oh, yes, I know.

A. -- that says that certain things should go in a person's personnel records or not.

Q. Are you also saying that there are prohibitions against other things going in the personnel file?

A. But why would you put instructions in my personnel file? The purpose of that is for job performances. What you need to know is how I perform on my job. I don't have a problem with them putting the score of my performance in

there. I had a problem with them putting derogatory things in my file, because that could ruin my career.

Q. So, you're just not happy with them adding anything other than the performance appraisals to your personnel file?

A. That's all that needs to be in there.

Q. In your opinion?

A. Well, that -- I think the rules may say that.

Q. But you can't tell me what rule?

A. I can't.

Q. Okay. So, back to DOT. You said that when you were not hired on several occasions for the ASA III job, that you did take action?

A. Yes, I did. I wrote -- I wrote some letters to Mr. Brown and to the Transportation director.

Q. And what did those letters

say?

A. That was just explaining to them the procedure that he -- he used. And as Mr. Brown, and Mr. Brown was my class representative for the Consent Decree. There was a law in place called the No Bypass Rule --

Q. Yes.

A. -- that was not adhered to in that particular situation.

Q. So, did you file a grievance?

A. At that particular time?

Q. Uh-huh.

A. No. My grievance was already filed, Ms. Carter.

Q. But it didn't relate to this, it related to something else.

A. Yes, it did. It related to the information that he got out my file in Ms. Crosskno's office.

Q. But you're saying that after time you were passed over for another job -- I mean, maybe I'm getting the chronology

A. Yeah. He said it did.

Q. Okay. In his letter?

A. Uh-huh.

Q. Okay. Did you contact Medicaid about that, then?

A. No, I didn't.

Q. Why not?

A. Well, I -- because -- Well, I mentioned to Medicaid, in some of my letters that I wrote to the commissioner.

Q. Okay.

A. That I was passed over by Transportation. Because I knew at the time that transportation -- he -- Mr. Brown from Transportation had gotten the information out of my personnel file.

Q. Okay. ADECA, you said before that they were the -- one of the thirty-two that passed you over; is that right?

A. Yes.

Q. Okay. How do you know what the basis of their decision was not to hire you?

A. There was a letter sent to me.

Q. So, you had a letter on that one, too?

A. Uh-huh.

Q. Do you have a copy of that one?

A. Not presently.

Q. And did it specifically mention your file from Medicaid and the attachment to your performance appraisal?

A. Information filed in my personnel file.

Q. Okay. Information found in your personnel file, but it did not specifically say it was the performance appraisal or specifically say it was the attachment to the performance appraisal; is that true?

A. It did not, that I can remember, say that.

Q. Okay. And the same was true with DOT; is that right?

A. Well, DOT was more specific.

Q. Oh, and it did mention the performance appraisal and the attachment?

A. Yes, yes.

Q. Okay. The Insurance Board, are they one of the thirty-two?

A. Yes, ma'am.

Q. Okay. And you were not hired as an ASA III there either; is that right?

A. Right. I think there were, like, a couple of interviews there, also, if I'm not mistaken. There were at least two, I know, at the Insurance Board.

Q. You mean you applied two different times?

A. I didn't apply, my name came up on the register and they sent me letters for an interview.

Q. Okay. And regarding the first time, do you recall how you learned you were not hired?

A. They sent me letters. They all sent letters, or I got a phone call.

Q. Well, do you remember if it

was a letter or a phone call?

A. I believe I got a letter from the Insurance Board, and a phone call.

Q. And did they tell you why?

A. Because I had to communicate with the interviewee -- people interviewing me.

Q. Okay. Did they tell you why you weren't hired?

A. Information found in my file.

Q. Okay. But they were not specific?

A. They were not as specific as Transportation.

Q. Okay.

A. None of the others was as specific as Transportation.

Q. Okay. Can you remember any more?

A. I interviewed at Medicaid for an ASA III position.

Q. Oh, so there was one at Medicaid, too. And you were passed over for

that one as well?

A. Someone else was selected.

Q. Okay. Which means you were passed over, is that right, or is that different?

A. I wouldn't call it a passover. I think they just selected someone else.

Q. Well, in these other cases, did they not select someone else?

A. Well, they were asking for the passover.

Q. Okay. But with Medicaid, they didn't ask for a passover, they just selected another candidate?

A. Exactly.

Q. Okay. So, then, you didn't receive anything from them about them basing their decision on the performance appraisal or the attachment?

A. Well, I was in-house, so I may have received a phone call or something.

Q. Okay. But I guess what I'm getting at, Ms. Coley, is this is different

from the others where you say their decision was based on the performance appraisal, or the attachment to it; is that right?

A. I believe that one was.

Q. Okay. So, Medicaid is an exception there; is that right?

A. (Witness nods head in the affirmative.)

Q. You need to say it out loud.

A. Someone else was selected.

Q. Have you told me about all of the promotional and advancement opportunities that you believe you were denied because of the discrimination and --

A. Well, I think we've discussed the situation as to the extent of the information I can give you on it right now.

Q. Okay. You say: Defendant placed negative information in my personnel file as well. Have you already told me about that?

A. The negative information is the attachment to the evaluation.

Q. And you don't have a copy of that?

A. No.

Q. Okay. Do you recall what part of the attachment to the evaluation you were unhappy with?

A. Well, as I said previously, the attachment in itself is mostly instructional, but it gives the appearance of my being a problem employee.

Q. Well --

A. Say, for instance, if you're looking for an employee, you go and look at their personnel file, the first thing when you open up, you're going to see these three or four pages attached to an evaluation that says: Meets standards.

Q. Uh-huh.

A. But then you look and you see all these instructions, and it looks -- you know, it's going to give a negative appearance.

Q. You're of the opinion that it

letter from personnel about Mr. Brown's letter?

A. Yes, I did.

Q. And do you have that response?

A. I don't.

Q. Okay. Do you remember what you said about the information from Medicaid's file?

A. I think I referred them to the no-bypass law, and I explained to them the situation that I just explained to you about Ms. Crosskno, and my grievance not being heard. Because I felt like he, Mr. Brown, himself, which is not anything to do with Medicaid, had used some information that was unfounded. And it was just allegations because it had not been proven.

Q. But that had nothing to do with Medicaid, though, you said?

A. No.

Q. Okay. All right. Well, that's fine. Was there anything else about the attachment that you were unhappy with?

was held.)

Q. Okay. So back to paragraph four, you said: Discrimination in performance appraisals, plural. So there's a different one besides the June '03 one with Linda Lackey and Mary Finch; right?

A. There is.

Q. Okay. What's the next one?

A. It's the one with Mr. Mike Murphy.

Q. Okay. When was that?

A. I believe it was done in July.

Q. Is that part of your production response?

A. This is -- You have copies of what I have over here.

(Defendant's Exhibit 3 was marked for identification purposes.)

Q. Okay. Let me go ahead and mark -- We started doing this before, marking -- Ms. Coley, we marked first, Defendant's Exhibit 2, which is Defendant's

document what you say constitutes discrimination?

A. Well, I can show you what I had a problem with here because this -- If you go from 11/3/03 to the time of the evaluation, go to -- if you look at this page (indicating).

Q. Uh-huh. What does that say?

A. From '03 to 5/13/04.

Q. Uh-huh.

A. November '03 to 5/13/04, I had been through several offices then. Remember we discussed how the offices changed in and out?

Q. Uh-huh. So, is the timing of this one of your complaints?

A. It is the timing of the evaluation. Also, the entry on Corrective Action Plan, which they titled for the attachment, was carried over to my new job.

Q. Are you aware of any rule that prohibits that?

A. Well, if you go to a new job,

Q. Well, do you think by virtue of it being attached to this interim appraisal that it was still an issue?

A. I think it was brought back in to be an issue.

Q. Uh-huh. And you're unhappy with that?

A. Yes, I am.

Q. Okay. Anything else with regard to attachment one?

A. I think that this attachment to the appraisal, the Corrective Action Plan, was brought back around because it was still an issue with the department because I had complained of Ms. Rawls attacking me. I had complained of that. I think that this was maliciously done to sabotage my career.

Q. Okay. So, you think that right here on the second page of the performance appraisal where it says: Describe areas of employee's performance that need improvement as observed during the first nine months of appraisal period, see

attachment one, you think they put attachment one in here because of --

A. Actually, Ms. Carter --

Q. Let me finish my sentence.

A. I'm sorry, excuse me.

Q. -- in retaliation for you complaining about Ms. Rawls, you say, attacking you; is that right?

A. Ms. Rawls assaulted me.

Q. Or assaulting you?

A. Yes.

Q. And you think that's why this attachment one was put in there?

A. I think it was why they went back and got it, because prior to my preappraisals with Ms. Harvest -- See, I only received that preappraisal with her. She never discussed a Corrective Action Plan with me.

Q. Well, she signed this document, didn't she?

A. But, did you see the date she signed it.

Q. Well, and it looks to me like the attachment one is about right now. It's talking about what areas need improvement, based on your first nine months. So that would include her period of time --

A. It wouldn't be based on my first nine months, Ms. Carter.

Q. Well, that's what it says.

A. It is what it says. That's my point.

Q. I don't understand. You're just unhappy, that's the basis of it?

A. No. I'm unhappy is because it was not done according to procedure. It is incorrect.

Q. So, your problems, again, with the procedure, or what you say the procedure is?

A. What my problem is, is that the method that they used to do it, and why they did it. They should not have done it this way. This is not procedure.

Q. How should they have done it?

A. I should have had -- When I went to my new job, I should have had a preappraisal, I should have had a six-months appraisal, and I should have had a twelve-month.

Q. And what rule says you're entitled to that, Ms. Coley?

A. There are rules in the handbook.

Q. Well, which ones are you talking about?

A. Well, I am not able to give you that rule right now, but I will.

Q. Today is the day I need it.

A. Well, I think you can get it later, if you'll accept it.

Q. Well, I'm going to object to anything you provide to me later.

A. I'm sure.

Q. Okay. So see attachment two, then. It says: After document of action plan that has been discussed to improve the areas of weakness, and it has a Corrective

Action Plan.

A. Yes, ma'am. See, this is attached -- This goes with the Corrective Action Plan. The nine-month interim goes with that.

Q. Well, I understand, Ms. Coley.

A. The Corrective Action Plan is the one and the same that Mary Finch and Linda Lackey -- it's the same document.

Q. Does that tell you these are things they still want you to work on?

A. No. What it tells me is tells me that they have come together to try to sabotage my career with State Medicaid.

Q. That's your belief; right?

A. Yes, it is.

Q. Let's just go ahead and look at the Corrective Action Plan. It says: Portions of the following Corrective Action Plan may look familiar to you because it addresses problems that were identified nearly a year ago and that continue to be evident.

This action plan will make clear to you the expectations for improving weak performance and give you practical steps towards meeting those expectations. Working hours and use of leave, breaks and lunchtime. And then it goes on to give you some counseling about those areas; is that right?

A. Yes, ma'am, it does.

Q. And do you -- Did you understand that your work hours were seven-thirty to four-thirty?

A. Yes, ma'am.

Q. Did you have a problem with them telling you that if you found that you needed to change those hours, that you were to notify them and they'd change them if possible?

A. No, ma'am, I didn't have a problem with that.

Q. Did you have a problem with them telling you that more than two late arrivals would result in additional

corrective actions?

A. I did.

Q. You did?

A. Yes, I did.

Q. And why is that?

A. Because I -- I'm not the only one that comes -- I mean, where does it say that --

Q. Well, apparently your boss has said this.

A. Well, my boss has to follow procedures, though. The State have guidelines that they need to go by, Ms. Carter.

Q. Ms. Coley, I'm aware of that.

A. There's nowhere written that says that two tardies will constitute a corrective action.

Q. Well, are you telling me, then, that your boss doesn't have any discretion whatsoever to give you guidance?

A. He does. He sure does. He does have, and he should have had. But,

also, when you're doing that, you do have to have guidelines that you have to follow. You don't put unreasonable stipulations on the employee.

Q. Ms. Coley, so you believe, then, that it's unreasonable for you to be counseled again with additional corrective actions if you're late more than two times, yes or no?

A. Well, Ms. Carter, I don't know of anybody who is going to come to work a whole year and not be late a couple of times.

Q. Well --

A. So I think that that was one of the things that he was discriminating against me. Because I know that there were employees working in that section with me who were often late.

Q. Okay. Tell me who they were.

A. Robin Rawls. Who took off work. And I know because I was keeping the time. I was the time secretary.

Q. Okay. And Ms. Robin Rawls --
A. She took off in the afternoons to go get her daughter. She never turned in her time.
Q. Ms. Robin Rawls was in the same position as you or not?
A. She was not in the same position.
Q. And she was, in fact, a supervisor, was she not?
A. She was not my supervisor.
Q. But she was a supervisor?
A. She was a supervisor.
Q. Okay. Who else?
A. But supervisors have to follow procedures, too.
Q. Well, that's your opinion?
A. That's State personnel rules.
Q. Which rule?
A. I don't have a number for it, but I can produce the rule.
Q. Ms. Coley, are you aware of a rule that says that supervisors and ASA I,

II and III all have to abide by the exact same rules for when they arrive at work?

A. Well, there is a rule that you do have to abide by the time that you come to work.

Q. And what rule is that?

A. I don't have the number for it.

Q. Okay. But in any event, this says: More than two late arrivals will result in additional corrective actions. And what you've told me here today is that you are unhappy with that because supervisors, like Robin Rawls, didn't have to follow that rule?

A. Well, I believe I was the only one that had to follow that rule.

Q. Tell me who else didn't have to follow that rule.

A. Nobody else in the department had to follow that rule because I kept the time and there were certainly ones who came in more than twice, after this was given to

me, who were not told the same thing that I was told.

Q. And was this given to you in response to being late before?

A. I have no idea.

Q. Well, were you late before?

A. Yes, I have been.

Q. Okay. Well, fine.

A. I think it was given in response to me because it came -- it's the same plan that was instituted by Ms. Linda Lackey and Mary Finch. It's one and the same.

Q. Well, let me ask you this. You said that you were the timekeeper, so you know when everybody came and went.

A. I did the leave slips.

Q. Well, do you know for a fact whether people were reprimanded or not for being late?

A. Well, I would have known whether or not they would have.

Q. How would you have known?

A. Because I would have had to produce leave slips for it.

Q. Okay. And nobody asked you to ever produce that?

A. Nobody ever asked me.

Q. Okay. Did anybody ever ask for your leave slips?

A. Yes.

Q. Okay. Next it says: You're expected to take morning and afternoon breaks to last no longer than the allowed time established in the AIMs manual. Let me know when you are going on break and when you have returned. Do you have a problem with that request?

A. I did have a problem with let me know when you're going and when you're returning because no one else had to do that.

Q. And that's the reason for the problem, because you thought that you ought to have the exact same rules as everybody else; is that right? Yes or no?

A. Well, I think that everybody should have to follow the same rules as far as when time guidelines come.

Q. Well, let me ask you this, Ms. Coley. You didn't hold the same job as Robin Rawls that you're comparing yourself to; is that correct?

A. I did not.

Q. Okay. Does it make sense to you that your boss might need to have different rules for knowing when you're coming and going than Robin Rawls' boss?

A. It doesn't matter. He needs to know when she goes and comes too.

Q. Well, how do you know that?

A. He does. Well, what if she just goes somewhere and he don't know where she is, or if she's coming in and he doesn't know what time she's coming in. I mean, he needs to know what time she's going to be there, or what time she's going to leave, he needs to know that, as well as he needs to know when I'm coming and going.

expected to call me as soon as you know you'll be out of the office on sick leave. Do you have a problem with that?

A. I don't.

Q. As much as possible, annual leave should only be taken when a leave request has been approved in advance of the leave being taken.

A. I don't have a problem with that.

Q. Next is following instructions: There have been occasions when you did not follow the instructions given to you resulting in task not being completed correctly or in a timely manner. Do you have a problem with that?

A. I do. Because I was never told what tasks that were not completed in a timely manner or correctly.

Q. And you're not aware of any on your own?

A. I'm not aware of any.

Q. Okay. In order to avoid that

A. I said she was not supposed to assign me any work. She had been given instructions not to.

Q. But she did anyway, you're telling me?

A. She tried to.

Q. And what did you do?

A. I went to Mr. Murphy.

Q. Did you take care of it?

A. He took care of it.

Q. Okay. So, then, that sentence: At any time you don't understand what you're to do, you're to contact me or the person that assigned it to you so that we can verify what needs to be done. You were okay with that and able to handle that by going around Robin Rawls; is that right?

A. Yes.

Q. Okay. If tasks and assignments are not completed according to instructions, this will be reflected on your annual evaluation and result in additional corrective actions. Fair enough?

A. Yes.

Q. Number three: Performance and completion of assigned tasks, reviewing work before turning in to appropriate staff member. This says: Upon completion of tasks assigned to you, including, but not limited to, typing of administrative claims, review, letters and forms, you are expected to review your work to verify the task has indeed been completed accurately before submitting to the appropriate staff member. Any problem with that?

A. No.

Q. You are expected to carefully proof and correct your own mistakes so that the work is error free when turned in. Fair enough?

A. Yes.

Q. Rarely should a staff member need to return work to you for correction. Rarely should deadlines be missed unless there are very unusual circumstances or unless priorities have changed and your

supervisor is aware and approving of those changes. Do you agree with that?

A. Uh-huh. Yes.

Q. Okay. If you are ever unsure of the expectations surrounding an assignment or task, notify me so that we can get you the needed clarification. More than two instances of work being turned in with errors, and/or not on time, will result in additional corrective actions being taken, including a lowering of at least one rating on your annual evaluation. Any problem with that part?

A. I have a problem with that part.

Q. Okay. Tell me which sentence we're talking about.

A. I mean, if you're -- Well, my -- Part of my assignment was to type X amount of letters a day, sometimes thirty or forty.

Q. Uh-huh.

A. There's -- I don't know of any

typist who could probably turn those letters in without no typographical errors, one or two. There could be some, but, you know, if you type that many letters per day, you may have, like, miss a period at the end of a sentence, or you may miss something.

Q. And you don't think that you should be expected to have no typos in your letters?

A. That's the purpose of on your Form 40 saying who will proofread your work or who will check your work before completed, that's the purpose of that.

Q. You didn't have anybody to check your work?

A. I believe there was somebody that checked it.

Q. Okay. So, then, is it unreasonable to expect your work to be error free when it's turned?

A. Yeah, it is sometimes. Not all the time. You know, you don't turn in -- You can't turn in error-free work all the

time. Nobody can. We're imperfect humans.

Q. Well, I agree with you on that, Ms. Coley.

A. I think that's an unreasonable statement.

Q. Do you?

A. I do.

Q. So, you just think it's unfair to require --

A. That part, that part, that part.

Q. Okay. Do you recall what your score was for proofreading and -- Do you recall that you were rated on typing and proofreading documents?

A. What document are you looking at, the evaluation?

Q. It was your performance appraisal.

A. Yes.

Q. Did you disagree with the score?

A. I did disagree with that

Friday, Thursday if we have a Friday holiday. Are you okay with that?

A. Yes. And the thing about it is, nobody else had to do a project list. I was the only one that was asked to do the project list and send it in.

Q. And you know that because you were paying attention to what everybody else was doing?

A. No. I know that because when I sent mine, there was no others sent.

Q. How do you know there were no others sent?

A. Because I asked a couple and they said they didn't have to do a project list.

Q. Okay. And do you think you had to do a project list because of your past performance, they wanted to keep up with what you were working on?

A. I think the project list was instituted from the attachment that Mary Finch and Linda Lackey did. I think he just

brought it down from them.

Q. Okay. Were you the only ASA III at the time?

A. At the time I was a II.

Q. A II. Were you the only ASA II at the time?

A. In that section.

Q. In that section?

A. Uh-huh.

Q. Okay. So, again, you would have different job duties and responsibilities than everybody else working around you; is that not true?

A. That's true.

Q. Okay. So, then, is a project list unreasonable?

A. I don't think that a project list is unreasonable. I think it's unreasonable in that he asked only me to do it.

Q. But you were the only one who held that job title; right?

A. Yeah. But I'm not the only

employee there. There was --

Q. So, it's your contention, then, every employee like -- Let me just give you the example of my law firm. I'm a lawyer in this firm, and I have a secretary. Do you think the same rules should apply to her work as to my work?

A. Well, certain rules should. There are some that would not apply, but certain should, standard rules.

Q. Well, if I require her to keep a list of what she's going to do every day?

A. I don't think that's unreasonable.

Q. Okay. Does that mean I have to have a list for my boss upstairs?

A. I think you should. I think you should.

Q. I thought that's what you were going to say.

A. If you're going to ask your employee to have a list, I think you should set an example. I think you should have a

list for yours, too.

Q. So, you think, then, the same rules should apply to you, no matter what your job title is?

A. Certain rules.

Q. Okay. Next it says: Each Friday you are expected to send me an e-mail describing the assignments you worked on during the work and their status, and then it gives an example. Failure to adhere to this portion of the Corrective Action Plan will result in a lowering of your annual evaluation and additional corrective actions being taken. Are you okay with that?

A. Can you repeat that again for me, please.

Q. Reach Friday you are expected to send me an e-mail describing the assignments you worked on during the week and their status. And then it gives an example. Failure to adhere to this portion of the Corrective Action Plan will result in a lowering of your annual evaluation and

additional corrective actions being taken. Are you okay with that?

A. I'm okay with the first part.

Q. But you don't want to be disciplined for it, then, if you fail to do it?

A. Well, I don't think that -- Say, for instance, if something happens I get busy and I can't send you the e-mail that you've asked me for, or it could be beyond my control. I could be upstairs working on some maps or something. Somebody else could have asked me to do something. If I don't get back down to do that e-mail to you, I think that that's asking -- I have a problem with that.

Q. Well, let me ask you this, Ms. Coley. This --

A. If I could send it as soon as I'm available to send it, I think so.

Q. Is it fair to say that you don't want any rule to apply to you that may result in a lowering of your score on your

evaluation?

A. No, it's not fair to say that.

Q. Well, then, what rule are you willing to abide by, because each one we've talked about, Ms. Coley, you said: Only if I can do it, or only if I can get an extension if I need it?

A. I'm willing to abide by the same guidelines as any other employee, not specific rules you have set up just for me to go by.

Q. Even if you have different job responsibilities?

A. Job responsibilities won't have anything to do with some of the rules that were set up. If you have jobs -- If you have employees, no matter what capacity they're in, they're going to have the same -- even if you are a nurse, if you ask me for a project list, I think that you should ask the nurse for a project list.

Q. Well, that's your opinion, Ms. Coley --

A. It is my opinion.

Q. -- but you're not the one making the rules about who gets to have a project list.

A. Well, neither was Mr. Murphy.

Q. Well, he was making the rule about you. And you just don't like them, you told me.

A. Well, I don't like some of rules. I didn't say I didn't like any of the rules. I said that I was satisfied with abiding by the same rules as everybody else. These were not the same rules --

Q. Yeah. So you only like rules that apply to everybody across the board. Any time it's different, you don't like it; is that a fair statement?

A. Well, if it's different and it's negative toward me.

Q. How is -- Let me ask you this. How is it negative to require you to provide a project list and to tell you what's going to happen in advance if you don't do it?

standards, at best. Do you have a problem with that?

A. Yes, I do.

Q. Okay. Do you have a problem with the first part: A copy of this will be placed in your personnel file.

A. That's what I have a problem with. Because what I'm saying is, right back to what I've been saying all the time, instructions to an employee should not be placed in your personnel file.

Q. Okay. I understand that you think that that's something that shouldn't go in the file.

A. Well, nobody else has them in their files.

Q. And have you seen those files?

A. I've never talked to an employee, in my whole almost twelve years, who has had instructions placed in their employee files.

Q. And have you seen their personnel files?

Q. Okay. First, let's talk about -- Well, tell me what disparate treatment means to you.

A. It means that I'm being treated differently from other employees that I work with, and treatment that has caused me hardships, or for me to be uncomfortable in situations.

Q. Okay. And we'll talk about what you consider to be harassment in a minute, but let's go ahead and talk about the retaliation. I want you to list for me every single thing you think was an act of retaliation that you're referring to in this paragraph.

A. I think that the evaluation that Mr. Mike Murphy gave me was retaliation, in retaliation to my complaining about Ms. Rawls' assault on me.

Q. Okay. So, you think Mr. Murphy's evaluation, which is the one we just went over; is that right?

A. Right.

Q. So, you're saying that that was an act of retaliation?

A. Yes, I think it was, to give me a low score.

Q. So, the low score in that evaluation, you think was in retaliation?

A. Yes, ma'am. Because some of the duties I didn't even perform. Some of those duties I never performed.

Q. Which duties are you talking about?

A. Let me go back to the document. See where it says N/A (indicating), I never performed those.

Q. So, do you think you were evaluated on them?

A. In his office, I never completed travel forms.

Q. Let me see what you're pointing to.

A. Okay. On the back of the evaluation. Right here (indicating). See.

Q. Okay. Well, because it says:

Not applicable there under the rating --

A. I did not perform them. So they shouldn't have been even listed.

Q. Well, wait a minute, Ms. Coley. By the fact that it says: N/A, doesn't that mean to you you were not evaluated on it? There's no score there.

A. Well, it looks like I could have been evaluated on it, even though it does say --

Q. But it says: N/A.

A. So, why would he list it?

Q. Well, he listed it, but then said it is not applicable. So isn't that the same thing?

A. Well, if you're not going to do it, why list it?

Q. Well, maybe that's because these ten things are enumerated as responsibilities normally for your job. I don't know why. Do you know why?

A. No, I don't.

Q. But the truth is, it says:

N/A beside three of these. So you weren't evaluated on them; right?

A. Okay. I never had to establish priorities for completion of a division project, I never had to do that.

Q. You never had to make decisions about what needed to be done first?

A. No. I was always told.

Q. You were always told?

A. What I needed to do.

Q. Okay.

A. If I was told.

Q. If you were told?

A. Uh-huh.

Q. So, if you weren't told, do you think it was up to you, based on your many years of experience?

A. Well, I was never told to do anything that I didn't do. That's what I'm saying. My instructions -- The instructions that I was given always came from him.

Q. Okay. What else?

A. What, I mean, serves as secretary and administrative support --

Q. Were you not serving as a secretary and an administrative support, as an ASA II?

A. I mean, that's just -- That's just a title. It doesn't state what I did or how I did or what. It's just a title.

Q. So, you're just unhappy with this whole document; is that right? You don't like the way they described your duties?

A. Not the whole document. I'm unhappy with the things that I'm pointing out to you.

Q. Okay. Anything else?

A. Well, I never really had no files to establish and maintain. There wasn't files -- There weren't any files.

Q. Okay.

A. When I was in his office, there weren't any.

Q. Okay. And you filed a

you think people went out and changed your work?

A. I'm saying that I don't know that that happened or not. I'm saying that they could have. They had the capability.

Q. Do you know if what was on the Q drive was the basis of the evaluation?

A. I don't know that.

Q. Okay. Back to paragraph six --

A. But the letter -- Excuse me. But the letters were mentioned.

Q. Yeah. I see the letters.

A. And the letters were the ones that I remember I got the zero score on.

Q. Uh-huh.

A. And that's why I'm giving an explanation as to the letters.

Q. Okay. Going back to paragraph six, you were telling me that this evaluation by Mr. Murphy, you think, is in retaliation because of complaints you made. Is there any other act of retaliation?

A. Other than the fact that I think that he -- he had set out from the offset, because he never wanted me to come to work for him.

Q. Okay. Ms. Coley, my question is, is there any other act of retaliation besides the evaluations? I'm looking for concrete instances.

A. I think that that was an act of retaliation, with the evaluations, because he never wanted me to come to work for him.

Q. I understand you think the evaluation was. But I'm asking for anything else. I understand the retaliation is one thing. I'm looking for the next thing.

A. Can you explain a little bit further what you're looking for to me?

Q. Well, you say in your lawsuit that: Defendant's conduct is discriminatory with respect to the following, and you check other, and you say: Retaliation, because of complaints made to HR regarding harassment

back to the evaluation, doesn't it?

A. It does.

Q. Okay. Besides the evaluation, anything else? And I'm not saying there is anything else, I'm just telling you now is the time to tell me.

A. And the remarks that he made to me.

Q. Okay. What remarks did he make to you?

A. Well, during a meeting that we had about the last assault on me by Ms. Rawls, he -- in a condescending way he looked at me and looked at Ms. Rawls and said: I can see why she would be afraid of you. Well, I wanted to know why he felt that way.

Q. Did you ask him?

A. I did.

Q. And what did he say?

A. Well, just looking at you and looking at her, I can tell why she would be afraid. He never really answered me.

Q. Well, how did she look?

A. I mean, how did she look?

Q. Yeah. He said it was because of the way she looked and the way you looked. Tell me how she looked.

A. No. He said: By looking at her and looking at me, myself.

Q. Okay. So, he was looking at her, and I'm asking you, in your opinion, how did she look when you were looking at her?

A. She looked like a person to me.

Q. Okay. So, you don't know what he meant?

A. I don't know what he meant. But I did ask him the question as to what he meant by that.

Q. And his response was?

A. His response -- He didn't really give me a response.

Q. Okay. So, that's a --

A. I wonder if he meant it was

because I'm black, a black lady, or --

Q. Did you ask him that?

A. I did not ask him that.

Q. Okay. So, that's two things you've told me that you think are retaliation from Mr. Murphy; right?

A. Uh-huh.

Q. Anything else? Any other act of retaliation?

A. Not that I can think of right now.

Q. Okay. And you say that that retaliation was a result of the complaints you made to HR. What complaints did you make to HR?

A. I made -- I -- When I had the first assault that I had, Ms. Rawls, I did a write-up about what happened and I turned it in to personnel.

Q. Okay. And we're going to talk about that in a minute.

A. And the second one I turned in to personnel. And the third one is I think

that he retaliated against me because they sent me to his area when he really didn't want me there.

Q. Why did he not want you there?

A. Well, prior to the agency placing me in his area, he went to personnel, viewed my personnel records, again, it goes back to that statement, the attachment, he viewed, and he and Ms. Cathy Hall felt like -- Cathy Hall was the deputy commissioner for the area, felt like they were getting a problem employee.

Q. Was that accurate?

A. It was inaccurate.

Q. Okay. And how do you know they felt like they were getting a problem employee?

A. Because the deputy commissioner, Mr. Lee Maddox, called me into the office, sit down and talked with me and told me that they had expressed some concerns about getting an employee that was not -- was a problem employee.

Q. Uh-huh.

A. And I immediately asked him then, I said: It appears that Mr. Murphy and Ms. Hall does not want me in their unit. Could you please place me somewhere else in the agency, with someone who would be happy to work with me.

Q. Did you at any time think, wow, this gives me an opportunity to really show them what a great employee I am, and to prove them wrong and show them I'm not a problem employee?

A. Well, of course, I did.

Q. And did you make every effort to do that?

A. I did make every effort to do that.

Q. But you weren't successful in doing that?

A. Obviously not.

Q. Okay. So, those are the complaints. You told me about two that we're going to talk about in a minute. I

A. I named some white employees who worked in the area with me, yes.

Q. Okay. Are you referring to anybody else that you didn't already tell me about?

A. No.

Q. Okay. Then you say: White employees have resigned because they did not like the department, only to be rehired and placed where they desired. Who are you talking about there?

A. Her name would be Paige Clark.

Q. I'm sorry, Paige Clark?

A. Uh-huh.

Q. Okay. And was she an ASA II?

A. She was not.

Q. What job did she hold?

A. I believe she was a nurse.

Q. Okay. But you're comparing your position to hers; is that right?

A. I'm comparing the treatment, the disparate treatment -- the treatment that she was given as opposed to the

treatment that I was given, to her.

Q. Okay. And the treatment that you're comparing is that she didn't like the department, so she resigned, and was rehired somewhere else where she wanted to be hired; is that right?

A. What I'm saying is that at the time of the agency move, we were all being sent to different areas to work. The area that she was assigned to go to, she was unsatisfied with that area.

Q. Do you know why she was unsatisfied?

A. I just think she just didn't want to work in that area.

Q. Okay.

A. Is what she told me. She didn't want to work in that area, so she just resigned.

Q. And then she was rehired in another area?

A. Yeah. They hired her back the next day, I believe.

Q. And tell me why you have a problem with that.

A. I have a problem with that because, you know, when I was asking them to move me, I was asking them to move me from the area where I was, working with Robin Rawls, because I had been assaulted by her.

I asked them to move me to another area in the agency so I would not be in that environment. I mean, this lady quit. She didn't care if she lost her job or not. I didn't quit. I just asked them to move me to another area.

Q. Did you get on a transfer list, Ms. Coley?

A. What would -- Did I get on the transfer list?

Q. Uh-huh.

A. Yes. I was on a transfer list.

Q. You were?

A. I were.

Q. Was there anybody else besides

that nurse?

A. I mean -- Rephrase the question for me, please.

Q. Yeah. I'm going back to where you say: White employees are not subjected to the treatment I'm receiving. White employees have resigned because they did not like the department, only to be rehired in a place where they desired. You told me about the nurse. Is she the only one you're talking about there?

A. She's the only one that resigned.

Q. Well, is there anybody else that you claim was subject to better treatment than you, or not subject to the treatment you were receiving? I want to know who you're talking about when you write that sentence?

A. Okay. There was -- There was another employee by the -- I don't remember what Dawn's last name was. I don't know if she had any problems or not. But she -- she

requested -- You know, in doing the movement it was simple, she requested to be given a window, and they gave her a window.

Q. Uh-huh. Did you ask for a window?

A. Well, I didn't want a window. I wanted to be moved out of the office with Robin Rawls grabbing and pushing and jumping in front of me.

Q. Okay. Do you think those requests are different, though, asking for a window and --

A. I think they that -- I think that they are different requests. But I think that my request had a little bit more weight to it, don't you?

What I'm trying to get across here is that if you can hire a person back and put them in an area where they desire to work, and if a person can request of you to be moved in place where a window is, surely you can move me to a place where there's another opening for ASA II to get me out of

a situation where I'm being assaulted.

Q. Do you know of other openings for ASA IIs?

A. There was other openings.

Q. Which ones?

A. There was an opening in Certification that I interviewed for as an ASA II.

Q. But you didn't get the job?

A. I did not get the job.

Q. Do you know why?

A. I do know why. Because the positions were upgraded after I interviewed for them. After they made the announcement, I went and interviewed for the job, they were upgraded. And the supervisor told me she was going to hire me.

Q. Didn't that eliminate everybody else who was an ASA II? If they upgraded it, then people who were ASA IIs like you, then couldn't get the job; is that right?

A. Yes. If they were an ASA II

like me, they couldn't get the job. But why was the job suddenly upgraded?

Q. Okay. Anybody else, Ms. Coley, that you're referring to in that paragraph?

A. There was two employees that I know that were having -- that wanted to swap positions. They were allowed to do that.

Q. And did they hold the same position?

A. They did hold the same position.

Q. Was that your position, ASA II?

A. It was.

Q. It was?

A. Uh-huh.

Q. Were they in the Medicaid Department?

A. They were in the Medicaid Department.

Q. Okay. Did you ask for one of their positions?

A. No, I didn't want their position. I only wanted to be moved in a position where I could be moved to get away from Ms. Rawls.

Q. Okay.

A. Because I was in a situation where I was being assaulted.

Q. Okay. And then you say: No reasons have been offered for these actions. Do you think that Medicaid, or anybody else owed you explanations for their employment decisions with regard to people who were not ASA IIs?

A. I think Medicaid owed me an explanation as to why they were not moving me out of a situation that was stressful. It was a stressful workplace for me.

Q. Was it?

A. It was.

Q. And they didn't tell you why they were refusing to move you?

A. Well, he -- Mr. Maddox, when I talked with him, told me that he didn't have

anywhere to place me at the time.

Q. Okay.

A. But there were opportunities in the future, right after that, for him to place me, that I knew of. And I was still at Medicaid, that could have gotten me out of that situation, Ms. Carter.

Q. Did you talk to him again?

A. I did talk with him. And on each occasion that -- I talked with him, I think, on two occasions. When I talked with him, he was really rude to me. When I went in to talk with him, I sit down and I told him that I came -- And, actually, when I sit down to talk with him about it, what I -- he didn't even let me finish.

I was fixing to go through a situation then where I was going to explain to him what happened. And I think he got the wrong impression. So he asked me to leave twice. The first time he asked me to leave, I just thought, well, maybe if he'll just hear me out he'll understand what I'm

Q. Anything else?

A. Like prioritizing work, I hadn't done any of that.

Q. In all your years of working, you've never had to prioritize things?

A. Yes, in my State career I have, but not here.

Q. What kind of training did you think you needed to be able to prioritize your work?

A. Excuse me. I was scheduled for training because they were saying that I was having problems with this and that. They scheduled me for some training, but they cancelled it.

Q. Do you know why they cancelled it?

A. Saying that I was counting some pill packs and the pill packs weren't finished being counted.

Q. So, you hadn't finished what you had been assigned to do, so you couldn't leave to go to the training, is that what

you're telling me?

A. Well, the training -- The way they schedule the training is, they pay for us to be trained. And they were supposedly, since they had me on the Corrective Action Plan, supposed to have me a formal training going on. So if you're not going to let me go to the training to get the training, so how do you expect me to improve?

Q. Okay. So, do you recall what that training was for?

A. No. I do remember the date that it was cancelled.

Q. Okay.

A. Because it was my birthday.

Q. All right. Remind me what day that is.

A. It was August 13, 2003.

Q. Okay. Paragraph five goes on to say that: Although my evaluation states I meet satisfactory standards, unfounded statements, remarks, were placed in my personnel file, given to other State

A. Well, there was an incident that I mention later on in this document about an employee who offered to help me because he knew I had been given an overload of work.

Q. Tell me that again.

A. I said that there was an incident that happened with a coworker who offered to help me with some of my job tasks because he knew that I had been given an overload of work.

Q. I think you refer to that just a little bit down in the letter. Can I talk about it there?

A. I do. That's what I was telling you.

Q. Okay. But aside from that, nothing else?

A. No.

Q. Okay. Have you already told me everything that you think was false in that document?

A. I believe I have at this time.

A. I don't remember what Myron's assignment was.

Q. Was he an ASA II like you?

A. I don't think he was.

Q. Do you think it's unreasonable for your employer to expect you to do your job yourself, without getting help from other departments who already have work assignments?

A. Mr. Uptain, he was in my section.

Q. So, he was in your section, but he didn't hold the same job as you?

A. He did not hold the same job.

Q. Did he have his own work assignments?

A. Well, the particular assignment that we were discussing, he and another coworker had. When he approached me about it, he told me that he and the other coworker had developed a method to do it.

And that's why he was offering, because he knew that I had a

number of assignments going on. So he offered to help me with that particular one because they had come up with a method that they were to do it and get it done quickly.

He also stated that he knew that it would free me up to work on some of my other projects.

Q. But, ultimately, his boss didn't let him help you; right?

A. No, she didn't.

Q. Okay.

A. And that's when I ran into the problem with them saying that I was not doing my work, or that I wasn't meeting deadlines.

Q. Okay. Next you claim that from then on your supervisor singled you out, quote: As I now have concerted efforts on the part of higher-ups in this agency to place me under supervisors willing to go along with the discrimination and racism against me.

Are you talking about the

Q. Okay. You say: There have been unfair practices leveled against, and I assume you mean against you; is that right?

A. Yes.

Q. And you say: Those were the attacks by Robin Rawls.

A. One was the attack by Robin Rawls. And another was Mr. Maddox, the way he treated me when I went in.

Q. Which is what you've already told me about?

A. Yes.

Q. Okay.

A. And I already talked to you about the positions that he upgraded to keep me from being moved there as an ASA II.

Q. Okay. Anything else?

A. Well, I think Ms. Herman was unfair to me, in a way.

Q. Commissioner Herman, you're talking about?

A. Yes, Commissioner Herman.

Q. Okay.

A. I think she was unfair to me because she had the authority to do something about this and she just let it go on.

Q. You mean just by virtue of her position as the commissioner?

A. That's right. By virtue of her position.

Q. You're not referring to any specific --

A. By virtue of her position.

Q. Okay. Then you go on to say: As there are certain ones in this organization who are allowed to break agency rules and State laws as well.

And I believe before you told me about people that you thought didn't have to follow the rules, generally, and who didn't have to notify their supervisors about their comings and goings. What certain ones are you referring to here, if they're different?

A. They're not different.

about: I can see why she'd be afraid of you?

A. What else was he talking about? Because I'm not that much bigger than she is. I'm not a fat person. So I'm not huge.

Q. Do you think maybe he was talking about your demeanor?

A. I doubt it, because my demeanor -- Unless you're just a person who is timid -- I've never had anyone say that they were afraid of me before.

Q. Okay. But he did not say that he was talking about your race, did he?

A. No, he didn't.

Q. Okay. Next you say you asked for a transfer to an area with less stress, and that your health was being affected. You testified before that you were in good health. Are you just talking about the overall stress of what was going on?

A. Well, I was working in a stressful environment.

you met with Mr. Maddox before then about these incidences?

A. Yes. That was the time that he asked me to leave, I believe.

Q. Okay. So, this time he had somebody else in there with him, his secretary, Ms. Jones?

A. Yes. She was in there that time, also.

Q. Oh, she was?

A. Uh-huh.

Q. And you say here that he tells you that if you think you're going to come in there and talk about Ms. Finch, that you need to go ahead and leave now. And you recall that as being the case?

A. Yes.

Q. And was he saying that because these complaints related to the alleged assault?

A. I really don't know why he was saying it.

Q. And so, at the end of this

Q. Okay. You provided those to him?

A. Personnel provided them.

Q. Okay. Did you respond in any other way to this memo?

A. I did not.

Q. I'm sorry?

A. No.

Q. So, then, also in response to number three you provided what appears to be an undated letter to Mrs. Keeshan from you. This says: This serves as my second request for a hearing of my grievance with this agency.

A. Okay.

Q. There's also an inner-office memoranda from you to Ms. Keeshan dated 10/18/04.

A. That's what I'm looking for now.

Q. That indicates she received your request on that same day.

A. Uh-huh.

warrant the convening of a grievance panel or other action by Medicaid.

A. Yes.

Q. And they tell you that: If you believe you have been treated unfairly or abusively, that you can appeal possibly under the merit system to the State Personnel Board. Did you do that?

A. No. I didn't go to the State Personnel Board. I filed with the EEOC. That was another option that she gave me.

Q. Right. That's the next option. They say you can file an EEOC complaint, which is what you did. And she goes on to tell you that she regrets that your employment situation reached the point where you felt it necessary to file a grievance.

And she talked about the agency's goals to resolve things early. You know, that she hopes you will be willing and able to put past matters behind you and focus on future involvement with the agency.

everything, as being the commissioner.

Q. Okay. Why would you decide to file with the EEOC instead of the Personnel Board?

A. Well, because I wanted another investigation done. I felt like they would do a thorough investigation of the matter.

Q. Were you dissatisfied with their investigation, too?

A. No, I was not.

Q. Even though they were unable to determine that discrimination took place?

A. But there were some other things that they saw that were probably done to me that were not done right. So that's probably why they gave me the right to sue.

Q. Oh, is that what you think? Did they tell you that?

A. No.

Q. Okay. August 20, 2004, there is a memorandum attached to Commissioner Herman's findings. To Commissioner Herman from Bill Butler, through Lee Maddox, that

A. I did care about that. But I asked to meet with the Grievance Committee so I could be given a fair investigation. I was not given my meeting with the Grievance Committee. And I think that it spells it out in the AIM book that I'm entitled to a grievance proceeding.

Q. Can you tell me which provision?

A. I can't right now.

Q. Okay. Actually, the grievance procedures in AIM 404 provides in part: If the grievance is not resolved at the above level, it will be the responsibility of the HR office or designee to present a report to the commissioner on the grievance and the recommended action.

The commissioner will review the facts to determine if the grievance can be resolved based upon the recommended action, or whether a grievance panel is warranted. Does that seem to suggest there's a choice there?

A. Well, yes, it does.

Q. Okay.

A. Mr. Maddox was not the human resource person.

Q. That's not the question.

A. He's not the human resources person.

Q. And he apparently didn't make the decision. It says: Based on Mr. Maddox's and my investigation, it is our recommendation that the documented facts do not show an actual grievance, nor do they justify convening of the hearing panel?

A. You just read that he did, he had a part in this.

Q. Yeah, he did. But he had to be called off the investigation after you complained about him and somebody else brought in. And I believe you said a few minutes ago that they should have interviewed people. Who did they not interview that they should have talked to?

A. They did not interview me.

information attached to her evaluation cites specific tasks and actions that Ms. Coley needed to correct in her job duties and responsibilities.

Although Ms. Coley refused to sign the Corrective Action Plan regarding her job duties, this information that was attached to her rating is a bona fide must, and is appropriate for placement in her personnel file.

According to her personnel file, there is not a rebuttal from Ms. Coley addressing those issues and the Corrective Action Plan that was submitted in July of 2003.

In this issue Ms. Coley had a right to submit a rebuttal to the rating and request that this rebuttal be placed in her agency personnel file and State personnel file. But you didn't, did you?

A. I didn't do a rebuttal.

Q. Okay. A research of Ms. Coley's personnel file by Henry Davis

did not reveal any other information regarding a rebuttal, except the information dated June 13, 2003, that was attached to your Form 13 appraisal for 2003.

The only information that is in her agency personnel file is a memorandum dated January 12, 2000, from Benita Crosskno, office manager at Alabama DOT to Ms. Elaine Mayes Coley -- I don't remember you telling me your name was Mayes.

A. That was my second name. I told you my maiden name, Morris.

Q. Okay. So, Mayes was the name of your ex-husband?

A. Yes.

Q. Okay. -- for insubordination, with copies to Larry Lawsette's personnel file, and filed stating -- citing State Personnel Board rules section 670X19.01. General Work Rules 2B, for reasons for the memorandum regarding insubordination.

Then he goes on to talk about your allegation that Medicaid provided

information to DOT, or another department. And I believe we talked before, you complained about them providing your personnel file and said it was used against you; is that right?

A. Yes.

Q. Let me read to you what it says here. I did not obtain any information that validates Ms. Coley's charge of a reason for her not being selected from the ASA III certificate of eligibles.

Please note that although Ms. Coley states she is number one on the register, there are four other people ranked number one on the ASA III register.

Therefore, if DOT used Ms. Coley's 2003 annual rating and attached documentation outlining tasks that needed to be improved, this act is between State personnel and DOT, since Ms. Coley's overall rating in 2003 was meets standards.

Do you have a problem with any of that?

to DOT from Medicaid?

A. Did I file one with Medicaid?

Q. With DOT.

A. For?

Q. Failing to hire you when you applied from the ASA III register for a lateral transfer.

A. Are you saying did I file a grievance?

Q. Yes.

A. I did.

Q. Okay. So, then, you have two grievances against DOT?

A. Yes.

Q. And you don't have a file at home with all that information in it?

A. I don't have a file.

Q. You didn't keep any of that?

A. I don't -- I had some of things, like I said, some of them were destroyed.

Q. Some?

A. Well, I don't know which ones

A. I did get a hearing at personnel on that particular issue because I think they lumped them together, because I also, you know, wrote the letters to personnel about being passed over.

Q. So, you filed a grievance with the Personnel Department?

A. No. I filed a grievance. I asked personnel to meet with them, which I already let you know about in here. I asked them to meet with them about the passovers. I asked them to meet with the Personnel Board about the passovers.

Q. Did they conclude that racial discrimination had taken place, Ms. Coley?

A. The conclusion was that they upheld Transportation was right in passing over me.

Q. Did you appeal that decision?

A. I did.

Q. Did you win the appeal or lose the appeal?

A. I haven't heard anything from

A. Where are you?

Q. In your responses.

A. Number?

Q. Two.

A. Okay.

Q. Do you see that?

A. Yes.

Q. Okay. Before you told me you had good mental and physical health. Is that still true?

A. Yes, it is.

Q. Okay. You said you were denied training. We talked before about the training you didn't get to attend. Is there anything else you need to add to that?

A. No.

Q. Then you say: Job positions were upgraded to assure the positions were not available to me. And you talked some about that. But do you truly believe that the sole purpose of upgrading that position was so that you couldn't get it?

A. Those positions.

Q. And you don't know how many more people were not able to get that job because it was upgraded, is that true, too?

A. I don't.

Q. Okay. And then you say you were assaulted twice by Robin Rawls. I think we've talked about that in great detail. Do you have anything else to add?

A. Nothing else.

Q. The investigation the agency conducted was very discriminatory and then it was slanted to a defensive posture allowing white coworkers who are employed by the agency to express and make requests for themselves. What does make requests for themselves mean?

A. Well, the employees that we discussed, they asked for things and were given.

Q. What things?

A. Like the lady that asked for the window. She said she didn't want to be placed in an office that didn't have a

window.

Q. Okay.

A. So they gave her a window. And just like Ms. Clark, she said that she did not want to go to work in an area where she didn't desire to work.

Q. The nurse?

A. The nurse.

Q. Okay.

A. So they placed her in an area where she was happy.

Q. Okay. So, you've told -- Have you told me about everybody you're referring to there?

A. Yes.

Q. I just wanted to make sure it wasn't anything new. You say: I was never contacted or interviewed to express my concerns during the so-called investigation, although I made several written requests.

Ms. Coley, we just spent a lot of time talking about the meetings that you had with people. Are you denying that those

took place?

A. Well, some of the meetings were prior to. I believe when they met with me on these things, I'm saying during the investigation I was not interviewed.

Q. Well, two days after you filed the grievance, you were interviewed by Lee Maddox, were you not?

A. I don't know if it was two days after I filed my grievance or not.

Q. Well, are you denying you met with him soon after you filed?

A. I'm not denying that I met with him, no.

Q. Okay. And is that the investigation that you're referring to, the one after your July 2004 grievance?

A. There was an investigation, I believe.

Q. Is that the one you're talking about here? You say: I was never contacted or interviewed to express my concerns during the investigation.

Q. Okay. So, that's what you're talking about?

A. Yes.

Q. Okay. I just wanted to make sure that you were talking about the grievance you filed in July of 04?

A. Yes.

Q. Okay. Then I say: Provide the name of every Medicaid employee you allege Medicaid, or anyone acting on behalf of Medicaid, treated more favorably than Medicaid treated you. This is number three. I think we've been through all of these. I hope we have. Did we talk about Kim Black?

A. No.

Q. Okay. Who is Kim Black?

A. Kim Black is a white employee who was -- her position was moved into the position where I was after I was promoted from Medicaid.

Q. And she was an ASA III; right?

A. She was an ASA III.

Q. And you were an ASA II?

A. At the time.

Q. Okay. And what time period was that?

A. She was moved to the desk where I was sitting as an ASA II in January 2005.

Q. Okay.

A. As a matter of fact, she started that particular job the same day I started the job where I got promoted to the ASA III.

Q. Okay. You say Kim Black -- You say that: She as a white coworker was having problems working in the commissioner's office.

A. Right.

Q. How do you know about those problems?

A. Because she had discussed them.

Q. With you?

A. With someone.

Q. With who?

A. People in the agency. It was a rumor that I heard.

Q. Oh, it was just a rumor?

A. That she said that she was having trouble and she didn't want to be there.

Q. Okay. So, it was a rumor, then?

A. Yes.

Q. Okay. So, you don't know this for a fact?

A. Well, she got the job. She was moved.

Q. Did she apply for it?

A. That's what I based it on. Well, she didn't have to apply for it.

Q. Was she on the register?

A. She didn't have to be on the register.

Q. They just put her in there?

A. They did. Because they upgraded that desk. That was the desk of an ASA II. They upgraded that desk to move her

rumor, it's based on fact because they moved her.

Q. Well, all you know is that they moved her. You don't know the reason they moved her, do you?

A. I do know the reason they moved her.

Q. And what is that reason?

A. The reason they moved her is because she requested to be moved down there.

Q. That's right. But do you know what the basis of the request was?

A. Not really.

Q. That's what I thought. Christa Sanders is the next person you list.

A. Right.

Q. You said: She's a white coworker working in the same unit as yourself. What position did she hold?

A. Ms. Sanders is a nurse.

Q. Okay. So, she did not hold the position of ASA II?

A. She did not.

Q. She had problems with her immediate supervisor. How do you know about those problems, Ms. Coley?

A. We talked about it.

Q. You and Ms. Sanders talked about it?

A. Yes, ma'am.

Q. Was she one of your friends?

A. She was.

Q. Okay. Is she still your friend?

A. She is.

Q. Have you talked to her about this lawsuit?

A. No, I haven't.

Q. Tell me what she told you those problems were.

A. Well, she told me that she had some problems with -- And she didn't really go into a whole lot of detail with me about it. She said that they had some problems with some time or something that they were

having down in that section, about the time.

Q. What do you mean about the time?

A. Or her job performance, as far as turning her time in, leave.

Q. Okay. Anything else she told you about that?

A. She told me that they were all doing the same things and that they were just singling her out.

Q. Okay. So, she's a white woman, though, right?

A. She is white.

Q. So, she didn't think the singling her out was based on her race?

A. I don't know.

Q. Okay. Just a personality conflict?

A. I have no idea.

Q. Could yours have been just a personality conflict?

A. I don't think so.

Q. You say she was offered

employee assistance, what kind of assistance?

A. Well, I think that they said she had had some -- I think, if I remember, she told me she had had some prior problems with some things.

Q. What things?

A. I don't know particularly. But that they had offered her assistance and she was getting some help.

Q. Did she say what kind of help that was?

A. I think she went and talked to a psychiatrist or a psychologist, or something that they had gotten her some help.

Q. Did you ever ask to talk to a psychiatrist?

A. No, I didn't. Because I didn't think I needed to see a psychologist. Although my point was, if they figure I was having problems with my job performance, they should have offered me some help, or

they should have allowed me to get the training that was offered.

Q. I understand that's what you're saying.

A. Okay.

Q. You admit, though, that the agency representatives met with you over the course of several months and actually conducted an investigation in response to your grievance; is that right?

A. I don't -- No, that's not right.

Q. Well, just a few minutes ago we looked at your grievance, which was dated July 20, 2004. Two days later there's a report in the file that you acknowledge that indicates Lee Maddox met with you. Do you deny that?

A. Lee Maddox did not meet with me, he attempted to meet with me.

Q. Well, did the two of you sit together in a room and talk for a while?

A. Not for a while.

Q. Okay. And all the other supervisors were supposed to do that, too?

A. All of them that were in our section at that time.

Q. And you know that because?

A. I'm sorry, you have to rephrase that question.

Q. How do you know that's a rule for them, because you've never been in that position, have you?

A. Well, I was the leave clerk. Everybody turned the leave in to me because I was keeping leave for everyone at that time.

Q. Okay. Did you have any responsibility, like, if Ms. Rawls failed to turn it in to you, did you have any responsibility to talk to her about it?

A. I had the responsibility of letting my supervisor -- the one over me know that she hasn't turned it in.

Q. And did you do that?

A. I did. I did. Yes, I did.

Q. And do you know what the result of that was?

A. I think they had a couple meetings with her about it.

Q. Oh, so they addressed it, then?

A. I believe they did, but I don't know what the outcome was.

Q. Okay. You don't know what the outcome was. Okay. And then you say: I was not allowed that opportunity. Did you need to leave to pick up a child from school?

A. I did not.

Q. Okay. Do you think that just because she was given some leeway, according to you, on picking up her child from school, that you ought to be able to leave whenever you want?

A. I don't know if she was given the leeway or not.

Q. Oh, okay. So, you don't know whether she was reprimanded or denied or --

A. I know that there was a problem with it because the supervisor asked me about this.

Q. Okay. So, then, it seems to you they actually addressed this problem?

A. Well, it seems to me that she had lied to her supervisor about whether she was doing it or not.

Q. And her supervisors followed up by asking you about it; is that right?

A. Well, they did question me about the leave.

Q. Okay. And you said before you're not aware of the results of what happened?

A. No.

Q. Okay. So, then, how was she treated more favorably than you?

A. Well, I think that, first of all, she shouldn't have been able to go and get her child. That's just something that she was just doing on her own. She wasn't supposed to be able to leave and come back,

Q. Well, you filed a lawsuit based on race discrimination. And you say here that Medicaid could have promoted you to the position of ASA III in 2004 in the office of Kim Davis.

A. They could have promoted me. What I meant there was that in an effort to get me out of the situation that I had complained of, with the assaulting by Ms. Rawls.

Q. But you don't know who they hired?

A. I do know.

Q. You do?

A. Of the person, not the person.

Q. Do you know the person's name?

A. I believe it's Katrina Edwards, if I'm not mistaken.

Q. Do you know if she's white or black?

A. She's black.

Q. Okay. So, then, do you think that the decision to hire her and not hire

A. Well, I don't know whether they would have or not.

Q. Okay. I just wanted to make sure. When you said: Not against me, it made me ask the question.

Number fourteen: Each person identified in the preceding interrogatory. And you just incorporated your prior responses. And I think we've covered all of that.

Fifteen: The promotional and advancement opportunities you claim you were denied. Have we talked about all of those?

A. Yes.

Q. Number seventeen is about the promotional advancement opportunities. Do you know what your score was on the written exam administered by State personnel?

A. They don't give a score. They just place you in a band, I believe.

Q. In a what?

A. In a band.

Q. Do you know what your band

REPORTER'S CERTIFICATE

STATE OF ALABAMA,

ELMORE COUNTY,

I, Angela Smith, Registered Professional Reporter and Commissioner for the State of Alabama at Large, do hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the content herein was produced in transcript form by computer aid under my supervision, and that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings occurring on said date and at said time.

I further certify that I am neither of kin nor of counsel to the parties to the action; nor in any manner interested in the result of said case.

Angela Smith, RPR, CRR,
for the State of
Alabama at Large.